IN THE
CRIMINAL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LOUISIANA

STATE OF LOUISIANA                          NO. 490-990

VERSUS                                      SECTION "J"
                                            S_____
MICHEAL ALLEN                                   DY CLERK

NOTICE OF INTENT, AND   REQUEST FOR A  RETURN DATE TO
SEEK SUPERVISORY WRITS OF REVIEW IN THE COURT OF
APPEAL, FOURTH CIRCUIT.

MAY IT PLEASE THE COURT:

Micheal Allen, hereinafter referenced to as Mr. Allen, moves to inform the Criminal

District Court of the following:

1.

Mr. Allen intends to apply to the Honorable Court of Appeal, Fourth Circuit, for the

State of Louisiana, for Supervisory Writs, or Remedial Writs in the above titled and

numbered matter, from the denial of application for post-conviction relief on May 23, 2015.

2.

Micheal Allen wrote the Criminal District Court requesting a status check of his

application for post-conviction relief in early August of 2018. Subsequently thereafter,

Honorable Darryl A. Derbigny, Judge Presiding formerly notified Mr. Allen that his

application for (PCR) had been denied since May 23, 2015, and the instant pleadings filed

by Mr. Allen is considered repetitive.

Mr. Allen respectfully request that Honorable Judge Derbigny, Judge Presiding take

cognizance of the following: Mr. Allen asserts that in 2015 he filed a timely, and properly

filed application for post-conviction relief as Mandated in La.C.Cr.P. Articles 925 and 926,

No. 490-990. Mr. Allen additionally moves to inform the Court that the former case number

cited herein is the only application for (PCR) submitted in the Criminal District Court that

challenges his criminal conviction wherein Honorable Judge Derbigny, was Presided Judge.

Thus, the court's assertion that the pleadings submitted by Mr. Allen falls under the

repetitive laches of La.C.Cr.P. Art. 930.4, is being applied in a manner that's inconsistent

with Louisiana Supreme Court decisions regarding what constitutes a repetitive filing on behalf of a criminal defendant. Moreover Mr. Allen steadfastly maintains that the pleadings filed in the Criminal District Court raised no claims that were previously designated as errors on direct appeal.

Therefore, Mr. Allen request that the Court take Judicial Notice of the fact that Mr. Allen is presently before the Court seeking a notice of intent and request for a return date, plus an additional twenty day extension of time to file a Supervisory Writ into the Second Circuit Court of Appeal where the record evidences the Criminal District Court never notified Mr. Allen are the Custodian of Angola State Penitentiary that his (PCR) has been denied.

In support of the aforementioned fact Mr. Allen request that the trial court take Judicial Notice of the documentary evidence presented herein wherein he requested from Louisiana State Penitentiary Mail Room, the dates he recieved mail from the criminal District Court. Accordingly, the Mail Room provided Mr. Allen with dates starting from February 2, 2015 and ends on August 27, 2018, evidencing that Mr. Allen never received mail from the Criminal District Court. (See, Appendix annexed hereto titled (Priv2)).

Moreover, in light of the fact that the Criminal District Court fail to properly served Mr. Allen notice of its denial as required in La. C. Cr. P. Art. 930.1, which states:

> Article 930.1 Judgment granting or denying relief and written or transcribed reasons for the judgment shall be furnished to the petitioner, the district attorney, and the custodian. Historical Notes/ Official Revision comment— 1930. The petitioner, the district attorney, and the custodian must be furnished with copy of the judgment, including the reasons why relief was granted or denied.

As such Mr. Allen maintains that the documentary evidence submitted herein for this court's review warrants that the Honorable Court grant the instant pleadings and provide Mr. Allen an extension of time that dosen't exceed twenty days in which to perfect his Supervisory Writ.

3.

However Mr. Allen, in an effort to comply with the Uniform Rules of Court Appeals 4-2, and 4-3, respectively prays that the Honorable Court finds that Mr. Allen has established his claim that the court never notified him of its ruling and Mr. Allen is legally

106

entitled to pursue Supervisory Writs/Remedial Writs in this matter.

WHEREFORE, it is prayed that: The petitioner is granted an extension of 20 days in which to file for supervisory writs: remedial or(review) in this matter.

Executed, this _____ day of _____, 2018.

Respectfully Submitted

_____
Micheal Allen # 575625
Camp-D, Raven # 3 Right
Louisiana State Prison
Angola, Louisiana 70712

## CERTIFICATE

I hereby certify that I have served a true and correct copy of the foregoing on opposing counsel, by placing a copy of the same in the U.S. Mail, postage prepaid, on this _____ day of _____, 2018.

_____
Micheal Allen

107



NO._____

IN THE
COURT OF APPEAL, FOURTH CIRCUIT
STATE OF LOUISIANA

MICHAEL ALLEN,
*Applicant/Relator.*

VERSUS

DARREL VANNOY, Warden,
Louisiana State Penitentiary;
STATE OF LOUISIANA,
*Respondent.*

## PETITIONER REQUEST THAT THIS WRIT APPLICATION BE GRANTED AND THIS CASE REMANDED

ON THE DENIAL OF APPLICATION FOR POST-CONVICTION RELIEF FROM THE MAY 9,2018, RULING OF THE HONORABLE DARYL A. DERBIGNY, JUDGE RESIDING, ORLEANS CRIMINAL DISTRICT COURT, PARISH OF ORLEANS, SECTION "J", CRIMINAL DOCKET NUMBER: 409-990.

## ON APPLICATION FOR REMEDIAL AND SUPERVISORY WRITS ( AND/OR REVIEW)

### PREPARED ON THE BEHALF OF:
### MICHAEL ALLEN, PRO SE

Respectfully submitted

_Michael Allen #575625_

Mr. Michael Allen, Pro se
D.O.C.#575625-Raven-3/R
Louisiana State Penitentiary
Angola, La. 70712

*CRIMINAL PROCEEDINGS:*     Appendix "G-2"

108

 

## TABLE OF CONTENTS                                    PAGES:

QUESTIONS OF LAW PRESENTED..........................................................5

STATEMENT OF JURISDICTION..........................................................6

STATEMENT OF THE CASE..............................................................6

POST-CONVICTION RELIEF PROCEEDINGS................................................6

STANDARD OF REVIEW.................................................................8

CONCLUSION........................................................................19

CERTIFICATE OF SERVICE............................................................20

EXHIBITS IN SUPPORT OF WRIT APPLICATION...........................................21

*109*

 

## TABLE OF AUTHORITIES

PAGES:

State v. Allen, 129 So.3d 724 (La. App. 4th Cir. 11/20/13)...............................................6

State v. Allen, 140 So. 3d. 1174 (La. 2014)..................................................................6

Diesel Driving Academy, Inc. v. Ferrier, 563 So.2d 898, 903 (La. App. 2nd Cir. 1990).................................................................................................................7

State v. Lumpkin, 813 So. 2d 640 (La. App. 1st Cir. 3/28/02)........................................9

State v. Simms, 571 So. 2d 145 (La. 1990)..................................................................10

State v. Mena, 344 So. 2d 357 (La. 1976).....................................................................11

State v. Welsh, 371 So. 2d 1314 (La. 1979)..................................................................11

State v. Mena, 344 So. 2d 357 (La. 1976).....................................................................11

State v. Prudholm, 483 S. 2d 729 (La. 1984)................................................................17

State v. Johnson, 557 So. 2d 1030 (La. App. 4Th 1990)...............................................17

State v. Reed, 483 S. 2d 1278 (La. App. Cir. 1986).....................................................17

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2D 764 (1984)............18

## STATUTORY PROVISIONS

La. C.Cr.P. Art. 930.6..................................................................................................6

La. C.Cr. P., art. 924, et seq........................................................................................8

La. R.S. 14:30.1...........................................................................................................6

La. C.Cr.P., art. 930....................................................................................................6



## QUESTIONS OF LAW PRESENTED

(1) Did the trial judge erred in denying Petitioner's post-conviction relief application repetitive and stating that petitioner has filed an identical application post-conviction relief on the merits?

*Relator affirmatively answers:* <u>Yes</u>.

*111*




## ISSUES PRESENTED FOR REVIEW

1. Petitioner Allen asserts the affidavit submitted in support of the arrest warrant application is constitutionally insufficient to support probable cause to arrest him for the charge of second degree murder in this case.

2. Petitioner Allen asserts the in-court and out-of-court identification procedure used by police created a substantial likelihood of mis-identification and should have inadmissible in his trial.

3. Petitioner Allen asserts he received ineffective assistance at trial as his defense attorney failed to put the prosecutor's case through the adversarial process as envisioned by the Sixth Amendment of the Constitution and the right to counsel.

I. Petitioner Michael Allen contends his trial lawyer rendered ineffective assistance where his defense counsel failed to investigate the circumstances of his case prior to trial.

II. Petitioner Allen also asserts he is the victim of Systematic Ineffective Assistance of counsel as set forth in the assessment of trial level defense services in Louisiana 40 years after *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792 9 L. Ed. 2d. 799 held that: every person accused of a crime, whether state or federal is entitled to a lawyer at trial.

## Argument for Review

Petitioner adopt pages: 12, 13, 14, and 15 for review as to his ineffective assistance counsel claims, and the argument in the original application for post-conviction relief on the merits presented herein.

NO. _____

IN THE
COURT OF APPEAL, FOURTH CIRCUIT
STATE OF LOUISIANA

MICHAEL ALLEN,
*Applicant/Relator.*

VERSUS

DARREL VANNOY, Warden,
Louisiana State Penitentiary;
STATE OF LOUISIANA.
*Respondent.*

## APPLICATION FOR REMEDIAL AND SUPERVISORY WRITS (AND/OR REVIEW)

MAY IT PLEASE THE COURT:

The Application of Michael Allen, Relator appearing herein personally and in forma pauperis, moves with full reservation of his rights and respectfully represents the following to-wit:

### STATEMENT OF JURISDICTION

Jurisdiction is vested in this Honorable Court by virtue of LSA-Const. Article V., § 10(C) (1974); and La. C.Cr.P. Art. 930.6. This Honorable Court should exercise its supervisory jurisdiction.

### STATEMENT OF THE CASE

Petitioner was charged by grand jury indictment on October 1,2009, along with co-defendant Michael Treadno ("Mr. Treaudo"), with second degree murder of Mr. Brown a/k/a "Rat or Rat", a violation of La. R.S. 14:30.1. The Petitioner pleaded not guilty at his October 13, 2009, arraignment. The trial court denied the defendant's motions to suppress the evidence and the identification on January 26, 2010.

The defendant was tried by a twenty-person jury on September 26-28, 2011, and found guilty as charged. October 14, 2011, the trial court denied the defendant's motion for post-verdict judgment of acquittal and sentenced him to life imprisonment at hard

labor, without benefit of parole, probation or suspension of sentence.

Petitioner sought a timely appeal to the Fourth Circuit, Court of Appeal and the Court of Appeal affirmed Petitioner's conviction and sentence. *State v. Allen*, 129 So.3d 724 (La. App. 4th Cir. 11/20/13). The Louisiana Supreme Court denied writ application on May 30, 2014. *State v. Allen*, 140 So. 3d. 1174 (La. 2014). Mr. Michael Allen is currently serving his sentence with the Louisiana Department of Public Safety and Corrections at the Louisiana State Penitentiary.

## POST-CONVICTION RELIEF PROCEEDINGS

Petitioner timely a filed application for post-conviction relief into the Orleans Criminal District Court, Parish of Lafayette, for the State of Louisiana. (*See Application as Exhibit "A"*). On May 9, 2018, the Honorable Judge Darryl A. Derbigny issued an order denying petitioner's application without addressing the merits. (*See Judge's Order as Exhibit "B"*).

## UNREASONABLE DELAY

Petitioner submits that the trial judge or the clerk of court did not send petitioner a timely copy of the ruling/order within 30 days of such order. The Honorable trial judge ruled on the application on May 9, 2018, and petitioner did not receive copy until August 24, 2018, here in Angola. (*See Proof of mailing from the Criminal District Court, Section "J" as Exhibit "C"*). Mr. Michael Allen, is not at fault since trial judge failed to send a copy of his ruling within 30 days as required under La. C.Cr.P. art. 930.1. See *State ex rel., Clarence Foy v. Criminal District Court*, 669 So. 2d 393 (La. 3/15/96); *State ex rel., Lonnie Bilbo v. State of Louisiana*, 825 So. 2d 1154(La. 9/20/02).

Furthermore, LSA-R.S 13:910, states that the Clerk of Court is responsible for providing copies of such ruling signed by the trial judge. The Orleans Criminal District, Clerk of Court Office has failed in their duties as required by law in this matter.

## NOTICE OF INTENT TO APPLY FOR WRIT APPLICATION

On September 13, 2018, Petitioner filed a timely notice of intent to apply for

114

writs, into the Fourth Circuit, Court of Appeals. (*See Notice as Exhibit "D"*). Petitioner submit that as to this filing date the trial Court has not fixed or extended the time to seek application for supervisory writs and remedial writs or review to this Court. Here, Mr. Allen is not at fault since, Judge Darryl A. Derbigny, has not fixed a return date, when relator clearly filed his notice on time, as required under Rule 4-2 and 4-3.

On this point, Mr. Michael Allen has cited unique circumstances which are beyond his control and therefore should be allowed to proceed.

*STANDARD OF REVIEW:*

This Court review of a question of law is simply a decision as to whether the lower court decision is legally correct or incorrect. This has been referred to as an abuse of discretion standard. *Diesel Driving Academy, inc, v. Ferrier*, 563 So.2d 898, 903 (La. App. 2nd Cir. 1990). The standard is nothing more or less than the manifestly erroneous or clearly wrong criteria used by an appellate court in reviewing a trial court's factual findings.   In addition, the trial Court reasons for denial is as follows:

### ORDER

" The petitioner has filed a second post-conviction relief application with the court. After, reviewing the evidence and considering the law, However, the defendant's application is repetitive. This court denied defendant's identical post-conviction relief application on May 28, 2015. As such, Petitioner's post-conviction relief application is Denied in its entirety." (*See Trial Judge Ruling*)

Mr. Allen strongly disagrees, with the Honorable trial Judge ruling because the judge has clearly ignored the applicable law, regarding this matter. In addition, the trial Judge ignored the argument of Petitioner's post-conviction relief application. But that is not all, the trial judge rambled on claiming that "petitioner's application is Denied in its entirety.

Mr. Allen asserts that in 2015, he filed a timely and proper filed application for post-conviction relief as mandated in La. C.Cr. P., art. 924,' et seq., under Case Number: 490-990. Mr. Allen additionally moves to inform the Court that the former case cited

herein is the only application for (PCR) submitted in the Criminal District Court Court that challenges his criminal conviction wherein Honorable Judge Derbigny section. Petitioner inform this Honorable Fourth Circuit, Court of Appeals, that the trial judge is incorrect in his order denying petitioner's application as repetitive.

Petitioner has further evidence that there was no ruling on any application in the year of 2015, that he received from the Orleans Criminal District Court. *(See Angola's Mail Records as Exhibit " E ").*

Mr. Allen seeks relief under La.C.Cr.P., art. 930. 2. specifying, with reasonable particularity the factual basis for such relief. Additionally, Mr. Allen has clearly alleges claims which if proven, would entitle him to constitutional relief. Petitioner is entitled to some full and fair proceedings to correct an error of law. Petitioner presents the following claims for review on the merits.

## ASSIGNMENT OF ERROR ONE

The Fourth Amendment of the United States Constitution and Article I, Section 5, of the Louisiana Constitution prohibit unreasonable searches and seizures and provide that a warrant may not be issued without probable cause. E.g. *Illinois v. Gates*, 462 U.S. 213, 103. S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *Draper v. United States*, 358 U.S. 307, 79 S. Ct. 329, 3L. Ed 2d 327; *State v. Lumpkin*, 813 So. 2d 640 (La. App. 1ª Cir. 3/28/02). Both Federal and State Constitutions provide on the matter of unreasonable search and seizure, in pertinent part: "No warrants shall issue, But upon probable cause, support by oath or affirmation..."

In the instant case, petitioner Allen argues that detective Kevin Burns, Jr., of the New Orleans Police Department's Homicide Division, arrest warrant affidavit contained no affirmative allegation that the witnesses he relied on demonstrated they spoke with any personal knowledge of the crime, or the identity of the perpetrator, sufficiently to form a basis upon which a finding of probable cause could be made. Also, the affiant to the arrest warrant failed to indicate in his report, that his independent investigation

*116*

produced any source's of information, which led him to believe that the information was reliable.

During the Motion to Suppress the Evidence and identification hearing, detective Burns testified that he received information from a party whom was listed on the victim's cell phone as a favorite five, and that the victim left with an individual named Michael Treaudo. (Supp. Hearing Pp. 7). That person further stated that Michael Treaudo was the driver of a teal blue Chevy Tahoe. A witness whom lived on  scene of the shooting on 5700 Red Maple, spoke with detective Burns the following day. She stated that she heard what she believed to be gunshots and that the gunshots came from inside the vehicle. The witness further stated that when she looked out of her window, she observed a blue green Chevy Tahoe being driven by a black male small in size wearing a white t-shirt and talking on a cell phone. The detective then acknowledged that this was the same witness whom gave police the lead on the case the same day of the murder. (Supp. Hearing. Pp. 20). Detective Burns testified that he then showed this witness a photographic lineup which contained a picture of Michael Allen. However, the witness could not identify Allen as a person in the Chevy Tahoe. (Supp. Hearing Pp. 21). Several witnesses testified at the suppression hearing including the owner of the Chevy Tahoe which was alleged to be involved in the murder. (Supp. Hearing Pp. 4-102) None of those witnesses identified Michael Allen as being in the Chevy Tahoe before or during the murder of Arthur Brown.

Probable cause to arrest exists where the facts and circumstances within an officer's knowledge and which he has reasonable and trustworthy information sufficient to justify a person of average caution in the belief that the accused has committed an offense. Petitioner Allen argues that detective Kevin Burns failed to establish any corroborating evidence to reasonably support his sources veracity, reliability or basis of knowledge to support his assertion to the magistrate judge that probable cause to arrest him existed. E. g. *Illinois v. Gates*, supra; *Giordenello v. United States*, 357 U.S. 480, 78

*117*

S. Ct. 1245. 2L. Ed. 2d. 1503 (1958); *Gibson v. State*, 758 So. 2d 782 (La. 4/11/00). The Determination of probable cause, unlike the determination of guilt at trial, does not require the resolution of conflicting evidence required at trial. The evidence must support a reasonable belief that the person to be arrested has committed a crime. Cf. *Gerstien v. Pugh*, 420 U.S. 103, 95 S. Ct. 845, 43 L. Ed. 2d 54 (1975); *State v. Rodrigue*, 437 So. 2d 830 (La. 1983); *State v. Simms*, 571 So. 2d 145 (La. 1990).

Petitioner Allen argues that he was arrested June 10, 2009. One day before his co-defendant Michael Treaudo. (See New Orleans Police Report, supplemental report no. F-08717-09 Pg. 1-2). Thus, Treaudo's confession after his arrest a day later than Allen's should be constitutionally insufficient to support probable cause. The Court's have held that admissions of criminal activity carry their own indicia of reliability sufficient to support a finding of probable cause. *United States v. Harris*, 403 U.S. 573, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971); *State v. Mena*, 399 So. 2d 149 (La. 1981); *State v. Welsh*, 371 So. 2d 1314 (La. 1979); *State v. Mena*, 344 So. 2d 357 (La. 1976). The court have further held that where a person confession to a crime, the confession and implication of another is deemed highly credible and more reliable and trust-worthly than previous statements disavowing any knowledge of the murder, because confessions are statements against penal interest. See *Mena*, 399 So. 2d at 152.

Petitioner Allen asserts that since he was arrested a day before Michael Treaudo made his confession to police implicating him as the shooter, detective Burns did not posses any facts and circumstances within his personal knowledge to justify a man of average caution in the belief that he has committed or is committing an offense to justify his arrest. Detective Burns did not possess Michael Treaudo's information before he sought the arrest warrant for Michael Allen, nor did any of the numerous witnesses provide him with any information indicating that Michael Allen was with Treaudo on the day of the murder. In passing, on the validity of an arrest warrant a reviewing court may consider only the information brought to the magistrate judge's attention. In this case, the

affidavit to the arrest warrant did not set forth the underlying circumstances necessary to enable the magistrate to independently judge the validity of the information provided by the witness to form the conclusion that petitioner Allen committed the crime of murder and the affiant, detective Burns, has nothing in the affidavit to the arrest warrant to support the claim that the information he received from the witnesses in this matter was credible or reliable, so that the probative value of the report can be assessed by the magistrate on the information provided to him and whether the affiant had any independent knowledge from his investigation to support probable cause to arrest the petitioner. Wherefore, petitioner Allen asserts that this Court should find based upon the above facts and evidence that the police in this matter lacked constitutionally sufficient probable cause to arrest him.

## ASSIGNMENT OF ERROR TWO

Petitioner Allen argues that under the totality of the circumstances, the identification evidence given by State witnesses should have been ruled inadmissible by the trial court as the evidence failed to show that the procedure used by police negated every reasonable probability of mis-identification.

A lineup is unduly suggested if the procedure focuses attention on the defendant. E. g. *State v. Guillot*, 353 So. 2d 1005 (La. 1977). A strict identity of characteristics is not required, but a sufficient resemblance to reasonably test the identification is necessary. *Id*. Even if the procedure used was suggestive, an identification will be admitted if, under the totality of the circumstances, the identification id found to be reliable. See *State v. Johnson*, 759 So. 2d 1052, *writ denied*, 00-1949 (La. 9/21/01), 797 So. 2d 60.

Petitioner Allen contends that the identification of him as the person who shot Arthur Brown should have been ruled inadmissible as none of the witnesses relied on by police described him as the person whom they saw shoot Mr. Brown. In the instant case, State witness Yolanda Merritt testified that on Sunday morning, June 7, 2009, she heard what she believed to be gunshots. She then observed a teal colored SUV drive through

*119*

her neighborhood in New Orleans East occupied by two Black males. (Tr. Rec. Pp. 46-50). Witness Merritt testified that she was able to get a good look at the driver and the passenger of the SUV. She gave a description to police indicating the driver was a small built Black male, and the passenger was a bigger built guy. ( Tr. Rec. at 51). Also, that the drive of the SUV was talking on a cell phone with his head turned toward the passenger. Witness Merritt then testified that she felt something was strange about the vehicle and that she wrote down the last three digits of the license plate which was 709. She also testified that she noted the time, which she stated was 12: 33 p. m., and the color and make of the SUV, teal and Chevy on her sticky tab note pad. ( Tr. Rec. at 52-3). Subsequently, members of the New Orleans Police Department met with witness Merritt to obtain any identification information on the two suspects. Witness Merritt was able to tentatively identify the driver of the SUV, but not the passenger. (Tr. Rec. Pp. 55-60). When a defendant claims that he is not the person who committed the crime, the rationale found in *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2D 140 (1977); should be used to determine the reliability of the identification. The factors to be considered are:

1. the opportunity of the witness to view the criminal at the of the crime;
2. the witness's degree of attention;
3. the accuracy of his or her prior description of the criminal;
4. the level of certainty demonstrated at the confrontation; and
5. the length of the between the crime and the confrontation.

Petitioner Allen argues State witness Merritt, who lives on the scene of the crime, and observed the two occupants of the teal colored SUV failed to identify him as one of the occupiers she saw driving through her neighborhood Sunday, June 7, 2009. See *State Powell*, 677 So. 2d 1008 (La. App. 2d Cir. 4/12/96); *State v. Chism*, 591 So. 2d 385 (1991). Therefore her identification of him as a suspect in the murder should have been ruled inadmissible by the trial court. Additionally, another witness for the State Nicole Jackson, testified that she and Arthur Brown lived together and that Brown is the father of her child. ( Tr. Rec. Pp. 25-8). She stated that on June 7, 2009, at about 11:00 a. m. her

*120*

son came inside and said: Mama, Mike want Rat outside. She asked her son was it little Mike which is the nickname she knows Michael Traudo goes by. (Tr. Rec. p. 29). Her son replied yes, and she told Rat who it was looking for him. Five minutes later, her son came back inside and told her Mama, they have a girl outside that was Ray. At that point witness Jackson went outside to see who the girl was. The girl stated something about a cell phone she and Rat sheared. After she and the girl finished speaking she turned to go back inside to tell Rat what the girl said when little Michael Traudo learned up in his vehicle and asked Man Nicki, where Rat at (Tr. Rec. at p.30). Witness Jackson testified that she then went inside and told Rat that Mike was outside and Rat went outside to see what the girl wanted. When Rat came back in the house, he started toward the room where witness Jackson was to say something, stopped through his hands up like, fuck it, and turned around and left. She stated that she didn't see him (Rat) anymore after that.

Witness Jackson further testified that the way her hours is positioned she was able to see the driver's side of the SUV. After Rat left the house witness Jackson stated she went outside to see where he went. She was informed by some people that he go into a car. Later on that day Jackson' s son came running into the house saying Mom they got the man calling on the phone saying Rat got shot. Rat's sister also called Rat phone where a man answered and informed her that the person who owns the phone is dead. (Tr. Rec. p. 32). She asked the man the man to describe the person and what he had on. Once the man did so, she threw the phone down and started hollering. Later that day she met with a detective at her house who showed her a photographic lineup. Witness Jackson stated at trial she was able to identify a person in the photo lineup. Witness Jackson stated at trial she was able to identify a person in the photo lineup. The person she identified as being in the driver's seat of the car which Arthur Brown left her house in was Michael Treaudo. (Tr. Rec. at. p. 33).

During the cross-examination of witness Jackson by the defense Jackson testified that when she first went outside at 11:00 a.m., she didn't see anyone in the blue SUV. It

121

was when she was going back inside that Michael Treaudo called her name and she looked back and noticed him in the driver's seat of the vehicle. (Tr. Rec. p. 36-7). Witness Jackson further stated that she didn't see Michael Allen in the SUV on June 7, 2009 when Rat got into the vehicle and left her house (Tr. Rec. p. 37). As a general matter when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. Petitioner Allen contends that the in-court identification of him by the witnesses for the State should be excluded as evidence as the witnesses made no previous identification at any lineup conducted by police prior to his trial. Cf. *U.S. v. Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d (1967); *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed 2d 401 (1972).The record does not reflect that the identification of petitioner Allen came from an independent source. It appears that police depended on a previous crime in which petitioner was alleged to be involved in 2004 that led them to conclude he was the shooter in the instant matter. See Transcript of Prieur Motion; State of Louisiana v. Michael Allen, No. 499-990, Criminal District Court, Parish of Orleans (2012).

Petitioner Allen asserts that it was not proven that he was the shooter of Arthur Brown on June 7, 2009, and gives these items for consideration:

1. witness Merritt's inability to describe him as the person whom was sitting in the passenger seat of teal colored SUV when it drove by her New Orleans East neighborhood on June 7, 2009.
2. the witness's attention seemed to be focused on the driver of the SUV and the fact that it was a strange vehicle in her neighborhood.
3. the witness failed to give a prior description of him to police.
4. the witnesses admitted at trial that they could not identify the passenger in the SUV.
5. the length of time between the crime and the confrontation did not affect the witnesses inability to identity him as the person in the passenger seat of the SUV.

The association of the driver and passenger with the SUV and the crime was established by means not directly bearing on whether petitioner Allen was the person seen with Michael Treaudo when he, Treaudo, allegedly picked up Arthur Brown in front of Nicole Jackson's residence and subsequently drove to new Orleans East where Mr.

122

Brown was ultimately murdered. Therefore, the identification of petitioner Allen by the State's witnesses in the photographic lineup, and subsequently in court, should have been ruled insufficient and ultimately inadmissible, as the identification evidence offered by the State to the jury failed a negate every reasonable probability of misidentification.

## ASSIGNMENT OF ERROR THREE

1. Petitioner Michael Allen contends his trial lawyer rendered ineffective assistance where his defense counsel failed to investigate the circumstances of his case prior to trial.

2. Petitioner Allen also asserts he is the victim of Systematic Ineffective Assistance of counsel as set forth in the assessment of trial level defense services in Louisiana 40 years after *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792 9 L. Ed. 2d. 799 held that: every person accused of a crime, whether state or federal is entitled to a lawyer at trial.

1. The Sixth Amendment right to counsel is the right to the effective of counsel. *McMann v. Richards*, 397 U.S. 759, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 764 (1984). A conviction defendant's claim that counsel's assistance was so defective as to require reversal of the conviction requires that the defendant show, first that counsel's performance was deficient and second that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Strickland, supra. In the instant case, petitioner Allen contends the his defense counsel failed to effectively challenge the information received by investigating officer Kevin Burns as to the truth of the identity of the passenger and the shooter as provided by the witnesses police interviewed. Allen argues that the information detective Burns included in his report shows the inability of any of the witnesses whom were questioned by police to identify him as the passenger or the shooter on the day of the murder.

Defense counsel had access to this information prior to Allen's trial. Therefore, he should have been prepared to attack the police investigation more thoroughly. At trial,

123

defense counsel's questioning of the state's witnesses revealed that those witnesses' merely identified of Michael Allen and Michael Treaudo, instead of whether they observed them commit crime. Under the totality of the circumstances, the identification evidence should not have been admissible at petitioner Allen's trial. (Tr. Rec. Pp. 103-111). If there is only one plausible line of defense, counsel should conduct a reasonably substantial investigation into that line of defense. Cf. *Rummel v. Estelle*, 590 F. 2d 103 (CA5 1979). In this case, the only question was the identity of the shooter. Thus, counsel should have focused on the key issue of whether anyone could identify his client as the shooter rather than whether the crime was committed.

Generally, the issue of ineffective assistance of counsel is matter more properly addressed in an application for post-conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. See *State v. Prudholm*, 483 S. 2d 729 (La. 1984); *State v. Johnson*, 557 So. 2d 1030 (La. App. 4Th 1990); *State v. Reed*, 483 S. 2d 1278 (La. App. Cir. 1986). Allen argues that he was prejudiced by his defense counsel's performance before the jury as counsel's focus was not on the key issue of the prosecutor's case, which was the identity of the shooter. Allen asserts that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different *Strickland*, supra, 466 U.S. at 693, 104 S. Ct. at 2068; *State v. Sparrows*, 612 So. 2d 191 (La. App. 4Th 1992).

As a result, Petitioner was deprived of his constitutionally guaranteed right to have effective assistance of counsel at his trial.

What's interesting, is in order to complete the record, the Court should find that it is appropriate to order an evidentiary hearing as to Petitioner claims ineffective assistant of counsel. To be sure, a statement from Petitioner's prior attorney appears to be mandated by the June 23, 2005, judgment of the Second Circuit, Court of Appeal in *State of Louisiana v. Lester Moody*, No. 40345-KH. In this case, the Court of Appeal granted the defendant's writ taken after the trial court summarily denied his application

124

for post-conviction relief, the court stated:

> "Ineffective assistance claims asserting omissions by counsel can rarely
> be ruled on without additional information, and ordinarily would
> require a response from the former counsel."

The Court further stated: the defendant's former counsel must file his response
into the record and the response should be served on defendant and the state's attorney,
with the court given a courtesy copy of the response. The state and the defendant should
be given 30 days to file further responses.

Finally, it has become increasingly clear that this Court should order a hearing
whenever there are question of facts which cannot be proper resolved from the record.
For all the reasons stated above Petitioner conviction and sentence must be reversed.

REQUEST FOR SUBPEONAS OF WITNESSES WHOM COULD TESTIFY TO THE
TRUTH OF THE ALLEGATIONS SUBMITTED IN PETITIONER'S CONVICTION
RELIEF APPLICATION, PLEASE ISSUE SUBPEONAS AD TESTICIANDUM

Representatives of:

The National Legal Aid & Defender Association
1140 Connecticut Avenue, NW Suite 900
Washington, DC 20036

The National Association of Criminal Defense Lawyers
1150 18th Street, NW Suite 950
Washington, DC 20036

It bare repeating: Petitioner adopt pages: 12, 13, 14, and 15 for review as to his
ineffective assistance counsel claims, and the argument in the original application for
post-conviction relief on the merits presented herein.

Hence, for readily apparent reasons, the trial judge is attempting to circumvent
Petitioner proper filed post-conviction relief claims with an unattainable process.

To avoid a miscarriage of justice, this Court must examine the constitutional
issues presented herein. In view of the foregoing facts and law plead by **Michael Allen**,
in his Application and Memorandums, as well as the mandatory language of Louisiana
Code of Criminal Procedure, **Article 924, et seq**, it is clear that the trial court abused its
discretion, without ordering an evidentiary hearing or other relief as justice requires.

125

Accordingly, this Honorable Court should grant his writ application, granting the relief it deems necessary and just.

The exhibits submitted sufficiently supports petitioner's allegation of substantial error; therefore, this Honorable Court should find, that in the interest of justice, petitioner claims should be reviewed on the merits. Petitioner seeks relief under La.C.Cr.P., art. 930. 2, specifying, with reasonable particularity the factual basis for such relief. Additionally, his pleading clearly alleges a claim which if proven, would entitle him to constitutional relief.

## CONCLUSION

For the foregoing reasons, the trial judge denial must be reversed; or in the alternative, this case should be remanded for reconsideration in the interest of justice and a evidentiary hearing be granted on the merits presented herein.

**PETITIONER FURTHER PRAYS**: that the court grant such further relief as may be deemed just and proper.

In Faith Whereof, I Set Forth My Hand this___day of _____, 2018.

Respectfully submitted

_____
Mr. Michael Allen, Pro se
D.O.C.#575625- Raven-3/R
Louisiana State Penitentiary
Angola, La. 70712

 

## CERTIFICATE OF SERVICE

I, Michael Allen, hereby certify that a true copy of the foregoing Writ Application has been served upon, Fourth Circuit Court of Appeal, Clerk of Court and the District Attorney, Parish of Orleans by hand delivering the same to the undersigned *ex officio* for placing said documents in the United States Mail, first-class postage, prepaid.

Executed, this____day of_____, 2018.


_____
Mr. Michael Allen, Pro se

127



**Criminal District Court**
Parish of Orleans
SECTION J
2700 Tulane Avenue
New Orleans, LA 70119

NEW ORLEANS
LA 701
28 JAN 15 '09
PM 2 L

ANGOLA, LA
70712-0099

Michael Allen, Sr.
#00575625
Louisiana State Penitentiary
Angola, LA 70712

70712-9800099

*"Exhibit "C""*

128

NO. _____

IN THE
COURT OF APPEAL, FOURTH CIRCUIT
STATE OF LOUISIANA

MICHAEL ALLEN,
*Applicant/Relator.*

VERSUS

DARREL VANNOY, Warden,
Louisiana State Penitentiary;
STATE OF LOUISIANA,
*Respondent.*

# EXHIBITS IN SUPPORT OF WRIT APPLICATION

MAY IT PLEASE THE COURT:

EXHIBIT "A" Application for Post-conviction relief

EXHIBIT "B" Trial Judge's order

EXHIBIT "C" Proof of mailing from the Criminal District Court, Section "J"

EXHIBIT "D" Notice of intent to apply for writs, into the Fourth Circuit, Court of Appeals

EXHIBIT "E" Angola's Mail Records

In Faith Whereof, I Set Forth My Hand this____day of _____, 2018.

Respectfully submitted

_____
Mr. Michael Allen, Pro se
D.O.C.#575625-Raven-3/R
Louisiana State Penitentiary
Angola, La. 70712

*129*

OFFENDER'S REQUEST FOR LEGAL / INDIGENT MAIL

NAME: Micheal Allen

NUMBER: 00575625

LOCATION: RAV 5 Right

BALANCE IN YOUR DRAWING ACCOUNT: $ _____

LIST EACH ITEM TO BE MAILED
GIVE THE NAME AND COMPLETE ADDRESS OF EACH
PIECE TO BE MAILED:

Hon. Nancy F. Delaney Con. Dist. Ct.
name
2700 Tulane Ave
address
New Orleans, La. 70119
city, state, zip code

_____
name
_____
address
_____
city, state, zip code

_____
name
_____
address
_____
city, state, zip code

ANY DELIBERATE MISREPRESENTATION WILL RESULT
IN YOUR MAIL BEING RETURNED

Micheal Allen #575625
offender's signature and number

_____          9/13/18
classification officer              date

130



Office Of The Clerk
## Court of Appeal, Fourth Circuit
State of Louisiana

Justin I. Woods
Clerk of Court

JoAnn Veal
Chief Deputy Clerk of Court

400 Royal Street
Third Floor

Mailing Address:
410 Royal Street
New Orleans, Louisiana
70130-2199
(504) 412-6001
FAX (504) 412-6019

## NOTICE OF JUDGMENT AND
## CERTIFICATE OF MAILING

I CERTIFY THAT A COPY OF THE WRIT DISPOSITION IN THE BELOW-NUMBERED MATTER HAS BEEN MAILED ON OR DELIVERED THIS DAY **12/07/2018** TO THE TRIAL JUDGE, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

JIW/dfj

**JUSTIN I. WOODS**
**CLERK OF COURT**

## 2018-K-1003

Michael Allen, #575625
LOUISIANA STATE PENITENTIARY
CAMP-D, FAL-2
ANGOLA, LA 70712

Leon A. Cannizzaro, Jr.
Donna Andrieu
District Attorney
619 South White Street
New Orleans, LA 70119

Appendix G-3

131



Office Of The Clerk

# Court of Appeal, Fourth Circuit
### State of Louisiana

Justin I. Woods
Clerk of Court

Joann Veal
Chief Deputy Clerk of Court

### 400 Royal Street
### Third Floor

Mailing Address:
410 Royal Street
New Orleans, Louisiana
70130-2199
(504) 412-6001

December 14, 2018

Michael Allen, #575625
Raven 3/R
Louisiana State Penitentiary
Angola, Louisiana 70712

RE: State of Louisiana vs. Michael Allen, 2018-K-1003

Dear Mr. Allen:

The above captioned identical writ was filed in this court on November 27, 2018.

COURT OF APPEAL,
FOURTH CIRCUIT

132

# The Supreme Court of the State of Louisiana

**STATE OF LOUISIANA**

No.2019-KH-00085

**VS.**

**MICHAEL ALLEN**

－ － － － － －

IN RE: Michael Allen - Applicant Defendant; Applying For Supervisory Writ, Parish of Orleans Criminal, Criminal District Court Number(s) 490-990, Court of Appeal, Fourth Circuit, Number(s) 2018-K-1003;

－ － － － － －

**September 24, 2019**

Writ application denied. See per curiam.

JDH

BJJ

JLW

SJC

JTG

SMC

Appendix "G-4"

Supreme Court of Louisiana
September 24, 2019

Deputy Clerk of Court
For the Court

133

SUPREME COURT OF LOUISIANA

No. 19-KH-0085

STATE OF LOUISIANA

v.

MICHAEL ALLEN

SEP 2 4 2019

ON SUPERVISORY WRITS TO THE CRIMINAL
DISTRICT COURT, PARISH OF ORLEANS



PER CURIAM:

Denied. The application was not timely filed in the district court, and applicant fails to carry his burden to show that an exception applies. La.C.Cr.P. art. 930.8; *State ex rel. Glover v. State*, 93-2330 (La. 9/5/95), 660 So.2d 1189.

Applicant has now fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, *see* 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within the limitations period as set out in La.C.Cr.P. art. 930.8. Notably, the legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Applicant's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final. Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, applicant has exhausted his right to state collateral review. The district court is ordered to record a minute entry consistent with this per curiam.

134.

# APPENDIX "H-1"

## RELEVANT PORTIONS OF THE TRANSCRIPTS

EXCERPTS FROM THE TRIAL TRANSCRIPTS
OF CASE NO. 490-990
PAGES 25-60, AND 103-111[1]

---

1   Renumbered here as Pages 136 to 180.

135

1    Judge, this was all brought out on the

2    Cross-Examination.  I am allowed to tie up

3    loose ends.

4    THE COURT:

5    Repeat the question, sir.

6    MR. COLLINS:

7    The question was -- I'll move on.

8    I don't have anything further.

9    MR. MALVEAU:

10    May I ask the detective one question?

11    THE COURT:

12    One question.

13    - RECROSS-EXAMINATION -

14    BY MR. MALVEAU:

15    Q.    Since the State asked you, the person who she

16    actually loaned the Chevy Tahoe to was Michael Treaudo,

17    correct?

18    A.    That's correct.

19    THE COURT:

20    You may step down, Detective.  Thank

21    you.

22    Call your next witness.

23    MR. COLLINS:

24    The State, at this time, will call Tasha

25    Jones.

26    *   ,  *    *    *    *

27    TASHA JONES,

28    after having been first duly sworn, did testify as

29    follows:

30    MR. COLLINS:

31    Good morning.

32    THE WITNESS:

25

136

1          Morning.

2          - DIRECT EXAMINATION -

3   BY MR. COLLINS:

4   Q.    Would you please state your name for the Record?

5   A.    Tasha Jones.

6   Q.    Miss Jones, if you could sit up and pull the

7   microphone closer to you.

8         How are you doing today, Miss Jones?

9   A.    Fine.

10  Q.    Do you have any convictions, Miss Jones?

11  A.    Yes.

12  Q.    How many?

13  A.    One from 1995 and one from 2009.

14  Q.    Okay.  And what was the 1995 conviction?

15  A.    Possession of stolen property.

16  Q.    Okay.  And what about the most recent one, 2009?

17  A.    Theft -- attempted theft.

18  Q.    Attempted theft, and that was a reduced charge?

19  A.    Yes.

20  Q.    And were you promised anything in exchange for that

21  reduced charge?

22  A.    No.

23  Q.    Okay.  Are you testifying here today because you

24  got a reduced charge?

25  A.    No.

26  Q.    Okay.  Why are you testifying here today?

27  A.    Because y'all called me.

28  Q.    Do want to be here today?

29  A.    Not really.

30  Q.    Do you know why you are here today?

31  A.    Yes.

32  Q.    I want to talk to you about the murder of Arthur

26

137

1  Lee Brown on June 7, 2009.  Now, going back to June 7 of

2  2009, did you have a vehicle?

3  A.    '07 Chevy Tahoe.

4  Q.    Do you remember what the license plate was?

5  A.    RPF 709.

6  Q.    How do you remember that so well?

7  A.    Because I had a Ford Expedition and I totaled it

8  and so it's "Rest in Peace Ford 709."

9  Q.    So at this time memory to your -- in homage to --

10  A.    That's the license plate they gave me.

11  Q.    And that is how you remember it?

12  A.    I just remember license plates.  It comes in handy.

13         MR. COLLINS:

14              I'm showing Defense, "25K," I believe,

15         Judge.

16  EXAMINATION BY MR. COLLINS:

17  Q.    I'm showing you this picture, Miss Jones.  Do you

18  recognize that picture?

19  A.    Yes.

20  Q.    What is this picture?

21  A.    That's the back of my truck.

22  Q.    With your "Rest in Peace Ford?"

23  A.    "Rest in Peace Ford."

24  Q.    Now, I want to direct your attention, Miss Jones,

25  to Michael Treaudo.  Do you know Michael Treaudo?

26  A.    Yes.

27  Q.    How do you know Michael Treaudo?

28  A.    I met Michael Treaudo through Michael Allen.

29  Q.    Okay.  And so you know Michael Allen?

30  A.    Yes.

31  Q.    Do you see him in court today?

32  A.    I see him sitting over there.

138

1   Q.   Can you point him out and describe what he is

2   wearing?

3   A.   I can't see that far, but a suit with the gray

4   shirt.

5        MR. COLLINS:

6             Your Honor, let the Record reflect

7             positive in court identification.

8   EXAMINATION BY MR. COLLINS:

9   Q.   How long have you known Michael Allen?

10  A.   I guess about a year and something before the

11  incident.

12  Q.   And did you know Michael Allen by any nicknames?

13  A.   Well, I used to call him "Stank."

14  Q.   Did you know him by any other nickname?

15  A.   Big Mike, since I met Little Mike, since there was

16  two of them.

17  Q.   So you knew Michael Treaudo as "Little Mike"?

18  A.   Right.

19  Q.   And did you see Michael Allen and Michael Treaudo

20  together?

21  A.   Yeah, all the time.

22  Q.   Okay.  They were friends?

23  A.   Yes.

24  Q.   Who is older?

25  A.   That's a good question, but I think "Stank" is

26  older than "Little" -- I mean Michael Allen is older

27  than Michael Treaudo, I think.  I'm not sure.

28  Q.   And what was their relationship like?

29  A.   They were friends.

30  Q.   And was there -- was someone in charge?  Was there

31  a leader?

32  A.   I wouldn't say a "leader," but I think Michael

28

139

1   Allen --

2       MR. MALVEAU:

3           Objection.  This calls for speculation.

4       MR. COLLINS:

5           From personal knowledge and personal

6       experience, Judge.

7       MR. MALVEAU:

8           She started with "I think."

9       THE COURT:

10          I will overruled that.

11          You may answer the question.

12      THE WITNESS:

13          I would say, I don't know.  Maybe it was

14      height inferior.  I would just always say

15      Michael Allen.

16  EXAMINATION BY MR. COLLINS:

17  Q.   So Michael Allen.  Would Michael Treaudo do things

18  for him?

19      MR. MALVEAU:

20          Objection, Judge.

21      THE COURT:

22          I will sustain that.

23      MR. COLLINS:

24          What is the basis of the objection?

25      MR. MALVEAU:

26          Vague and ambiguous.

27      THE COURT:

28          Rephrase.

29  EXAMINATION BY MR. COLLINS:

30  Q.   When Michael Allen asked Michael Treaudo to -- in

31  your presence -- to do things for him, would he do them?

32      MR. MALVEAU:

140

1          Objection, Judge.  It calls for

2      speculation; irrelevant.

3    THE COURT:

4          Overruled.

5          You may answer the question.

6    THE WITNESS:

7          Yes.

8 EXAMINATION BY MR. COLLINS:

9 Q.    Now, Miss Jones, this vehicle that you had, this

10 Chevy Tahoe, did you ever loan it out, going back to

11 June of 2009, did you loan it out to people?

12 A.    Yeah.

13 Q.    And did you ever loan it out to Michael Treaudo?

14 A.    Yeah.

15 Q.    And I want to take you to the day of the homicide

16 of Mr. Brown, June 7, 2009, going back to June 6.  Did

17 you loan Michael Treaudo the car?

18 A.    Yes.

19 Q.    And what circumstances had you loaned Mr. Treaudo

20 the car?

21 A.    I don't know.  He was going somewhere, and I was at

22 home, and I just told him to be back by 11:00 because I

23 was going to J's, a nightclub.  I went to sleep and I

24 woke up, and I looked at the clock and it said 11:00 and

25 I called him hooping and hollering on the phone, "Where

26 you at?  You know I'm ready to go out."  He had to be

27 close because he came back within five minutes.  He was

28 like, "Why you hollering 'cause you know you not going

29 out to no J's at 8:00."  I said, "It's not 8:00, it's

30 11:00."  He said, "Look at your phone."  I was wrong, it

31 was 8:00.  I said, "Well, make sure you are back for

32 11."  And I put on makeup, but I fell asleep, and when I

141

1  woke up it was the next day.

2  Q.   And that would be the Sunday morning, June 7?

3  A.   Yes.

4  Q.   And where was your car, was it at your house?

5  A.   No.

6  Q.   And were you able to find out who had your car?

7  A.   When I woke up, I had eight or nine missed calls,

8  and it was between Little Mike and Angie.   So when I

9  called Angie, she said that was --

10      MR. MALVEAU:

11              Judge, I will object to hearsay.

12      THE COURT:

13              Sustained.

14  EXAMINATION BY MR. COLLINS:

15  Q.   Miss Jones, who is Angie?

16  A.   Angie -- she got two daughters and they were

17  friends of Little Mike and Big Mike.

18  Q.   Okay.  And so you called -- after you called Angie,

19  what did you do next?

20  A.   When I was on the phone with Angie, the phone rung

21  and it was Little Mike.  Angie said --

22  Q.   Just stick to --

23  A.   I got to tell you how it went.

24  Q.   Okay.

25  A.   Little Mike was laying sleeping on the sofa and

26  when the phone rang, I said, "No, he can't be on the

27  sofa because he is calling me."  So, I answered the

28  phone and he was at the McDonald's on General Meyers.

29  Q.   That is Little Mike?

30  A.   Yes.

31  Q.   Michael Treaudo?

32  A.   Yes, and he asked me what I wanted from McDonald's,

31

142

1   and I ordered a sausage, egg, and cheese McGriddle.  And

2   about ten minutes later, he pulled up at the house and

3   came in there and gave me my breakfast and my cell

4   phone, and told me not to wake him up unless it was

5   about money.  And my words to him was I was not waking

6   him up no matter what.  And he went and laid on the sofa

7   and he went to sleep.

8   Q.   And --

9   A.   You wanted me to finish?

10  Q.   Yes.  I'm sorry.

11  A.   So, I proceeded because the belt came off of my

12  dryer, and I went in the kitchen, and I took down the

13  back of my dryer and was trying to put the belt back on.

14  Well, the way I had my phone if you called the extra

15  phone, if I didn't answer it, it would ring to my

16  personal phone.  So the little girl with the large

17  teeth, she called and she wanted me to wake him up and

18  I'm like, "I'm not waking nobody up." So, the phone was

19  going dead, and I went and put it on the charger in the

20  truck because I didn't have a house charger for the

21  phone.  So I'm in there with the dryer, but my phone is

22  constantly ringing because the other phone is forwarded

23  to my phone.  So I went out in the truck and got the

24  phone and un-forwarded it and sat it on the little bar.

25  When you come in the house there is a little bar on the

26  side of the living room, and I just kept messing with

27  the dryer.  So when the phone rung, I didn't even look

28  at it.  I hit the ignore button 'cuz I didn't want it to

29  wake him up.  And after that, the phone rung again.

30  Little Mike got up and grabbed the phone.  So, he looked

31  at me and he was like, "Ma, I --

32       MR. MALVEAU:

143

1              Judge, objection to the hearsay --

2    **THE COURT:**

3                  Sustained.

4                  Direct your witness.

5  **EXAMINATION BY MR. COLLINS:**

6  Q.   Miss Jones, try to limit your responses to what you

7  said, and what you did, and what you told him; okay?

8  A.   Okay.

9  Q.   Now, after Little Mike grabbed the phone and

10 answered it, and you observed him answer it?

11 A.   Yes.

12 Q.   Without getting into what he said, what did you do?

13 A.   Say that again.

14 Q.   What did you do after Little Mike got off the

15 phone?

16 A.   He asked me --

17 Q.   Without saying what he told you, what did you do --

18   **THE COURT:**

19              Ma'am, the idea is you can talk about

20           what you said, not what Michael Treaudo or

21           anybody else said.

22   **THE WITNESS:**

23              He asked me a question and I told him

24           that "Yeah, he could."  And I gave him the

25           keys, and he took the phone off the thing and

26           he left, and I continued to fix the dryer.

27 **EXAMINATION BY MR. COLLINS:**

28 Q.   Did you think anything about loaning Little Mike

29 the keys to your car?

30 A.   No.

31 Q.   And when is the next time that you hear about your

32 car?

144

1  A.    Somebody banging on my door like they lost their

2  mind.  And I opened the door and it's a man with a gun

3  pointed at me, wanting to know where my truck.

4  Q.    What did you tell him?

5  A.    I said Little Mike had the truck.

6  Q.    Is that all you told him?

7  A.    Yes.

8  Q.    Did you tell him where Little Mike was going?

9  A.    No.

10  Q.    Did you tell him -- okay.  First of all, who was at

11  the door?

12  A.    At first when I saw the man I didn't know if he was

13  a detective, because he was dressed like a little

14  skateboarder, and he was kind of young and short.  And

15  he went to asking me, and like, "Don't lie.  Where is

16  your truck?"  And I said, "Little Mike has the truck."

17  And he asked me where was Little Mike and I said, "I

18  don't know, but I can call the phone and find out."  And

19  he told me to call him, and I called him, and he told me

20  he parked my truck around his sister's house, and I was

21  like, "Round your sister?"  And he's, like, "Yeah," and

22  I was, you know --

23  Q.    Who is his sister?

24  A.    Arianna.

25  Q.    Arianna Treaudo?

26  A.    Yes.

27  Q.    Where did she live?

28  A.    Off of Whitney.  Might be LB Landry, one of them

29  streets, how it runs.

30  Q.    Where were you staying in 2009?

31  A.    On Blair.

32  Q.    On Blair.  Okay.  After you learned of where Little

145

1  Mike had left the car, what happened next?

2  A.   Well, the detective asked me where -- how do you

3  get there, and I told him where I could show him,

4  because I was trying to tell him because he was not

5  familiar with the West Bank, the Algiers area.  So I got

6  in the car with him and we drove past and it was, like,

7  a one way going up.  So we went around the house and

8  when we came up, I spotted my truck.  It had been washed

9  and shining like new money sitting in an open lot.

10  Q.   Did it look any different from when you last seen

11  it?

12  A.   It was washed.

13  Q.   It was washed?

14  A.   I don't wash vehicles.

15  Q.   Okay.  And did you inform the detective that that

16  was your truck?

17  A.   Right.

18  Q.   What happened next?

19  A.   Well, when he got out of the car I got out the car

20  and proceeded to walk behind him, and he turned around

21  and told me I couldn't come on the crime scene.  I was

22  like, "crime scene"?  And he said, "If a piece of your

23  hair fall in this grass then you're going to jail."  And

24  I ran out of the grass and tripped over the drain cover,

25  and got back in the car.

26  Q.   Prior to him telling you that, did you have any

27  idea about what the detective wanted with your vehicle?

28  A.   No, he wouldn't tell me and he still didn't tell me

29  until he got back in the car after he came from the

30  truck because I had hit the remote to open the door.

31  Q.   Okay.  And then you learned why you were there?

32  A.   Right.

35

146

1   Q.   Okay.  And what happened after that?

2   A.   Well, when he came to the car, he asked me did I

3   know --

4        MR. MALVEAU:

5              Judge, again, I ask to direct the

6        witness not to --

7        THE COURT:

8              Direct your witness.

9        MR. COLLINS:

10             Yes.

11       THE COURT:

12             Once again, you can't say what somebody

13        else said.

14             Proceed.

15       MR. COLLINS:

16             I ask that we be consistent in the

17        objections, Judge.

18   EXAMINATION BY MR. COLLINS:

19   Q.   What happened next?  What did you do?

20   A.   I sat in the car.  I was asked a question; I

21   answered the question.

22   Q.   What did you say?

23   A.   That's kind of hard.  Because I know I said, "I

24   don't know Arthur Brown, but I might know him by his

25   nickname."

26   Q.   And --

27   A.   I can't say -- he said it.  The detective said --

28   Q.   Well, did you eventually learn of the identity of

29   the deceased?

30   A.   Yes.

31   Q.   Who was that?  How did you learn?

32   A.   I knew "Rat Rat" from going up by the store and I

147

1   use to laugh and clown with him cause he used to call me

2   a old lady, and I used to say all kinds of things.  Just

3   nice kid.

4   Q.   That you knew from the neighborhood?

5   A.   Yes.

6   Q.   And do you know if him and Michael Treaudo or

7   Michael Allen knew each other?

8   A.   Yeah.

9   Q.   You seen them together?

10   A.   Yes.

11   Q.   Did you know if Michael Allen was better friends

12   with Rat Rat or if Michael Treaudo was better friends?

13       MR. MALVEAU:

14             Objection to vague and ambiguous.

15       THE COURT:

16             I will sustain that.

17   EXAMINATION BY MR. COLLINS:

18   Q.   Now, at some point, Miss Jones, did you relocate or

19   were you relocated to a police station?

20   A.   Yes.

21   Q.   And what happened when you got to the police

22   station?

23   A.   Well, when I got to -- I guess the Homicide

24   Division, because I don't know where it was, but they

25   were asking me questions.

26   Q.   What kind of questions, and you don't have to be

27   specific?

28   A.   How did I know Little Mike?  How did I know Big

29   Mike, and -- and basically like, what was our

30   relationship?  How did Little Mike get the keys and --

31   Q.   What did you tell him?

32   A.   What I just told you.

37

148

1   Q.   Everything that you told --

2   A.   He asked to use the truck and I gave him the keys

3   and that was it.

4   Q.   Did you receive any phone calls while at the police

5   station?

6   A.   Yes.

7   Q.   Who called you?

8   A.   I got a phone call from Arianna.

9   Q.   Arianna Treaudo?

10  A.   Yes.

11  Q.   That's Michael Treaudo's sister?

12  A.   Yes, and she was asking me --

13       MR. MALVEAU:

14            Judge, objection to hearsay.

15       THE COURT:

16            Sustained.

17       MR. NAPOLI:

18            Judge, that wouldn't be to the truth --

19       MR. MALVEAU:

20            Judge, can we decide who is directing

21       the witness?   -

22       THE COURT:

23            Once again, that was previous testimony.

24       The Court is going to reverse.

25            You may ask that question.

26  EXAMINATION BY MR. COLLINS:

27  Q.   Continue.

28       THE COURT:

29            Continue your response, ma'am.

30       THE WITNESS:

31            What was the question.

32  EXAMINATION BY MR. COLLINS:

38

149

1   Q.   Had you received a phone call --

2   A.   When I received the phone call She was asking me

3   how I was and what was going on and I asked her -- I was

4   telling her that "they have me down here saying that

5   Little Mike and Big Mike killed Rat Rat, and I just

6   don't believe it, but I'm at the police station so it

7   got to be real," and I was asking the reason why, and

8   she went to telling me what the street version was --

9   Q.   You told her you were at the police station?

10  A.   Right.

11  Q.   And you told her why you were there?

12  A.   Yeah.

13  Q.   And what did you tell her about why you were there?

14  A.   I told them because what the police told me that --

15  well, I can say what I said?

16      THE COURT:

17              Yes.

18      THE WITNESS:

19              Because the police said that they had

20          killed someone in my truck.  And that's why I

21          was there.

22  EXAMINATION BY MR. COLLINS:

23  Q.   And during the course of the time that you were

24  there, you were shown any pictures, Miss Jones?

25  A.   Yes.

26  Q.   I'm showing what is previously offered as 37 and

27  38.  I will show you 37, Miss Jones.  Do you recognize

28  that particular exhibit?

29  A.   I don't see no numbers on it.  I see Michael

30  Treaudo.

31  Q.   Okay.  I saw you look to the other side, what's on

32  the other side of that?

*150*

1   A.   37.

2   Q.   The handwriting, Miss Jones?

3   A.   My handwriting.

4   Q.   That's your handwriting?

5   A.   H'mm-h'mm.

6   Q.   And what is that?  What are you looking at?

7   A.    My printed name, my name in script, and the date

8   and the time.  You want me to read it?

9   Q.   Yes.

10  A.   "Tasha Jones, Tasha Jones, 6-7-09, 5:46 P.M."

11  Q.   Why did you sign that particular exhibit?  Why did

12  you look at those pictures?  Why did you sign your name

13  on the back of Michael Treaudo's photos?

14  A.    Because they asked me who I gave the truck to, and

15  it was Michael Treaudo, and they had the picture and I

16  had to point out the picture and sign my name on it.

17       MR. COLLINS:

18            I'm showing Defense, Exhibit 38.

19  EXAMINATION BY MR. COLLINS:

20  Q.   And I'm showing you 38, and just look at the front

21  and back of that.  You see your handwriting on that?

22  A.   Yes.

23  Q.   Where is your handwriting on that?

24  A.   Right here.

25  Q.   Whose pictures are in that particular exhibit?

26  A.   Michael Allen.

27  Q.   And you signed the back of Michael Allen's photos?

28  A.   Yes.

29  Q.   Why did you sign the back of Michael Allen's

30  photos?

31  A.    For the same reason -- well, not the same reason.

32  The question was:  "Who did Michael Treaudo go to pick

40

151

1   up?"  And I said, "Michael Allen."

2   Q.   Okay.

3   A.   And I had to point out who Michael Allen was out of

4   these pictures.

5   Q.   When did you tell the police that Michael Treaudo

6   was going to pick up Michael Allen?

7   A.   When the little detective was banging on my door

8   with the gun drawn and asked me where the truck was and

9   I told him where Michael Treaudo was supposedly going

10  to.

11  Q.   Okay.  And so in this particular set of photos, you

12  were asked to identify the person that you believed

13  Michael Treaudo was going to pick up?

14  A.   Yes.

15      MR. COLLINS:

16              Just a second.

17  EXAMINATION BY MR. COLLINS:

18  Q.   Without getting into what Michael Treaudo said,

19  before he left, did he tell you where he was going?

20  A.   Yes.

21      MR. COLLINS:

22              Nothing further, Judge.

23              - CROSS-EXAMINATION -

24  BY MR. MALVEAU:

25  Q.   I'm not going to keep you too long.  You said you

26  don't want to be here.

27      In reference to your Chevy Tahoe, you stated before

28  that you loaned the car to Michael Treaudo, correct?

29  A.   Yes.

30  Q.   And since it already came out, and you already

31  said, you said Michael Treaudo said he was going to pick

32  up Michael Allen?

152

1   A.   Yes.

2   Q.   And you said, "supposedly," correct?

3   A.   That's what he said.

4   Q.   And he told you "I'm 'supposed' to go pick up"?

5   A.   Can I say what he said?

6   Q.   You might as well now.

7   A.   He said -- really he was not saying, he was asking.

8   He asked, "Ma, is it okay if I go pick up Mike?"  He

9   didn't say where from.  He just asked if he could go,

10  and I was like, "Yeah, go ahead," and he left.

11  Q.   I got you.  So you don't know exactly if he picked

12  up Michael Allen or not?

13  A.   No more than the man in the moon.

14  Q.   You didn't know if he picked up anybody?

15  A.   No more than the man in the moon.

16  Q.   The one thing you know, you gave the keys to your

17  truck to Michael Treaudo, right?

18  A.   Yes.

19  Q.   You sure about that?

20  A.   I'm positive about that.  I gave him the key that

21  didn't have a remote, my extra key.

22  Q.   And that was the day of Rat Rat's murder, the day

23  you loaned your car the Michael Treaudo, right?

24  A.   Yes, sir.

25       MR. MALVEAU:

26            That's it, Judge.

27       THE COURT:

28            State?

29       MR. COLLINS:

30            Nothing.  Thank you, Miss Jones.

31       THE COURT:

32            Next witness, State.

153

1    MR. NAPOLI:

2         The State calls Lamyra Henry.

3         *    *    *    *    *

4              LAMYRA HENRY,

5    after having been first duly sworn, did testify as

6    follows:

7              - DIRECT EXAMINATION -

8    BY MR NAPOLI:

9    Q.   Lamyra, will you please introduce yourself to the

10   jury?

11   A.   My name is Lamyra Henry.

12   Q.   Where are you from?

13   A.   From Cut Off.

14   Q.   Is that in Algiers?

15   A.   Uh-huh.

16   Q.   Did you grow up there?

17   A.   Yep.

18   Q.   How long did you live in New Orleans?

19   A.   All my life.

20   Q.   Do you have any prior criminal convictions?

21   A.   Yeah.

22   Q.   Would you mind telling the jury what they are?

23   A.   Distribution of crack cocaine.

24   Q.   What year was that?

25   A.   '07.

26   Q.   Okay.  And do you have any other convictions?

27   A.   Yeah, I have a theft charge.

28   Q.   And Lamyra, do you know a man by the name of

29   "Arthur Lee Brown"?

30   A.   Yes.

31   Q.   How did you know Arthur?

32   A.   I don't know how 1 know him.  That was my kid's

43

154

1   dad.

2   Q.   How long did you know him?

3   A.   All my life.

4   Q.   Can you tell the jury a few things about Arthur?

5   Was he a good father?

6       MR. MALVEAU:

7            Objection to relevance.

8       MR. NAPOLI:

9            This man is deceased, Judge.

10      THE COURT:

11           Overruled.

12           You may answer the question.

13   EXAMINATION BY MR. NAPOLI:

14   Q.   You can answer?

15   A.   Yes, he was.

16   Q.   Lamyra, did Arthur have any nicknames?

17   A.   We call him "Rat."

18   Q.   Do you know why he had that nickname?

19   A.   He was small when he was a baby, I guess.

20   Q.   Do you know how long he had that nickname?

21   A.   Since I known him.

22   Q.   And you known him his whole life -- how long have

23   you known him for?

24   A.   All my life.

25   Q.   Lamyra, were y'all romantically involved?

26   A.   Yeah.

27   Q.   You said you had one child together?

28   A.   Yes.

29   Q.   And how old is that child now?

30   A.   Right now she is five.

31   Q.   And Lamyra, I want to take you to June 7, 2009.  Do

32   you remember that day?

155

1   A.   Yes.

2   Q.   Why do you remember that day?

3   A.   Because I talked to him that day, that morning, or

4   that evening.  He, like about 12:45 he called me.  He

5   had been calling me since 9:30 that morning.

6   Q.   So when you say "he" called you, who called?

7   A.   Rat Rat.

8   Q.   You say the first call was 9:45.  Was that in the

9   morning?

10   A.   It was about 9:30 early in the morning.  Several

11   missed calls I had from him and when I got up I called

12   him, like 12:45.

13   Q.   So around 12:45 you gave him a call.  Did he answer

14   the phone?

15   A.   No, he called me back.

16   Q.   And how long after you called him did he call you

17   back?

18   A.   Right back.

19   Q.   You called, missed call, and he called you right

20   back?

21   A.   Yes.

22   Q.   When he called you back did you answer?

23   A.   Yes.

24   Q.   You have a conversation?

25   A.   Yeah.

26   Q.   What did y'all talk about?

27   MR. MALVEAU:

28          Judge, again, I will note my continuing

29       objection previously, Judge.

30   THE COURT:

31          I will note a continuing objection.

32          You may proceed.

156

THE WITNESS:

He called and he was like, "What you

doing?" I said, "I just got up." He said,

"Right now I'm across the river," because I

just moved into this house down in the Cut

Off on Fairfax, and he was supposed to give

me some money for the utilities, and he said,

"Right now I'm across the river." But he

said, "If I make it back in the Cut Off I

will meet you in the park." And I said,

"Where you at across the river?" He said,

"Man, I will meet you in the park if I make

it back on that side." I said "Who you

with?" He said, "I'm with Sun." He was

like, "I'm with Sun and Mike."

EXAMINATION BY MR. NAPOLI:

Q.    Lamyra, I need you to slow down a little bit.

When he said he's "across the river," would that be

the East Bank or the West Bank?

A.    Had to be this side because we live across the

river.

Q.    When he said, "across the river," that would mean

the East Bank?

MR. MALVEAU:

Objection; leading.

THE COURT:

Don't lead.

EXAMINATION BY MR. NAPOLI:

Q.    Eventually, he came to tell you who he was with?

A.    I asked him. By him saying he was -- by him saying

he was across the river, 'cuz I know he didn't have a

car. I was like, "Who you with?" He said, "I'm with

46

157

1  Sun.  I'm with Sun and Mike."  I'm like, "All right,
2  Rat.  Just call me when you get in the park and I will
3  meet you in the park."
4  Q.   Now, why did you say "who" after he said "Sun"?
5  Did you not hear him?
6  A.   No, I didn't hear what he said.  That's why I asked
7  who, and he said -- and he said, "Sun." And I said,
8  "Who?"  And he said, "Sun and Mike."
9  Q.   After he told you he was with "Sun and Mike."  What
10 happened next that day?
11 A.   Well, I say about -- I give like five or
12 ten minutes, I hear my mom screaming because I'm outside
13 feeding my daughter cereal, and I could hear my momma
14 screaming from inside the house.  So I ran inside the
15 house, and I'm like, "Mama, what happened?"  And she's
16 like, "Nothing ain't happened.  You just stay here.
17 I'll be back."  Everybody left out and left me there
18 with the kids.  I say about the ten minutes later this
19 guy and that white boy pulled up, and he's like, "What
20 you doing here?"  I'm like, "Why?  What happened?"  And
21 he's like, "Man, they just found Rat dead."  And I'm
22 like, "I just talked to Rat Rat.  Rat Rat can't be
23 dead."  He's like, "They found Rat dead somewhere."  And
24 he said, "Get in the car because they say they found him
25 dead in the Cut Off."  And I got in the car with him and
26 went down there, and he wasn't at his house --
27 Q.   Lamyra, how long was it between when you got off
28 the phone with Arthur and you heard mom scream?
29 A.   It was not even not a minute or two later I hear my
30 mom scream.
31 Q.   And now eventually, did you meet with detectives
32 regarding this case?

158

1  A.    Well, the detective -- this happened Sunday because
2  I was off of work, so it was Sunday on the 7th of June.
3  The detective had to have been calling my phone on
4  Monday prior.  I had like 20 missed calls, private
5  calls, so I thinking somebody calling me actually to do
6  me something.  So I'm like, he decided to call me when I
7  got off of work.  I spoke to the detective about the
8  12:30, 1:00 because I left work early.  By me getting
9  all these private calls, I left work and I went home,
10  told my mom and dad, showed them my phone, all the
11  missed calls.  It was the detective and he called me and
12  asked if he could come see me.  I told him yeah, and he
13  was like, "Would you be okay if I see you?"  And I was
14  like, "Yeah," and he came out to my mom and them house.
15  Q.    Did the detective eventually meet with you?
16  A.    Yeah, he told me it was him calling me private,
17  because he didn't know who the number was or whatever,
18  and not a minute or second later before me and Arthur
19  Brown hung up the phone, he was killed.
20  Q.    When you met with the detective, did you tell him
21  what you had heard from Arthur that day?
22        MR. MALVEAU:
23              Objection; leading.
24        MR. NAPOLI:
25              Judge, that's not leading.
26        THE COURT:
27              Overruled.
28              You may answer.
29        THE WITNESS:
30              Yeah, told him.
31  EXAMINATION BY MR. NAPOLI:
32  Q.    At any point did you go to the Detective Bureau?

                                48

                                                    159

1   A.   Yeah, he did brought me down to the station to give
2   my statement and stuff like that.
3   Q.   And when you gave your statement, did he show you
4   any lineups?
5   A.   Yeah.
6   Q.   And when he showed you the lineups, who did he ask
7   you to identify?
8   A.   Michael Treaudo, first.
9   Q.   Okay.  And were you asked to identify the two
10  people that you were told that were in that truck?
11  A.   Yeah.  H'mm-h'mm.
12       MR. NAPOLI:
13            May I approach, Judge?
14       THE COURT:
15            Yes.
16  EXAMINATION BY MR. NAPOLI:
17  Q.   Miss Henry, I just handed what you is marked as
18  State's Exhibit 21.  Do you recognize that?
19  A.   Yep.
20  Q.   And can you turn it over, do you recognize anything
21  over on the back?
22  A.   Yep.
23  Q.   What is that?
24  A.   That's my initials -- that's my signature and the
25  date and the time.
26  Q.   Is that the lineup that the detective handed you
27  that day?
28  A.   Yep.
29  Q.   Did you make an identification on that lineup?
30  A.   H'mm-h'mm.
31  Q.   Who did you identify?
32  A.   Michael Treaudo.

49

160

1    Q.    Who did you identify Michael Treaudo as?

2    A.    Sun.

3    Q.    So when Arthur said "Sun" he was referring to

4    Michael Treaudo?

5    A.    Yeah.

6          MR. NAPOLI:

7                   May I approach, Judge?

8          THE COURT:

9                   Yes.

10         MR. NAPOLI:

11                  Judge, I've handed what's been marked as

12              "State's Exhibit 20."

13   EXAMINATION BY MR. NAPOLI:

14   Q.    Lamyra, do you recognize that?

15   A.    Yes, my initials with the date and time.

16   Q.    Can you flip it over?  Is that the lineup that the

17   detective showed you that day?

18   A.    Yes.

19   Q.    Who did he ask you to identify in that lineup?

20   A.    Michael Allen.

21   Q.    Well, when he showed you the lineup, did he tell

22   you who to pick out?

23   A.    No, he just asked me:  "Who was Mike?"

24   Q.    And when he asked you:  "Who was Mike," what did

25   you say?

26   A.    I pointed to the bottom picture in the middle, #5.

27   Q.    Okay.  And who is that person?

28   A.    This Michael Allen.

29   Q.    All right.  And do you see Michael Allen in the

30   courtroom today?

31   A.    Yeah.

32   Q.    Can you point him out for me?

50

161

1   A.    He right there.

2         MR. NAPOLI:

3              Your Honor, let the Record reflect that

4         the witness identified the defendant, Michael

5         Allen.

6              May I approach, Judge?

7         THE COURT:

8              Yes.

9   EXAMINATION BY MR. NAPOLI:

10  Q.    Lamyra, I want to take you back when you were

11  speaking to Arthur prior to the homicide.  Other than

12  you, did he ask to speak to anyone else?

13  A.    Yes, he asked to speak to the girls, Amyra and

14  Davionne (spelled phonetically).

15  Q.    Did he speak to them?

16  A.    Yeah, he spoke to both of them.

17  Q.    And after speaking with both of them, he got back

18  on the phone with you?

19  A.    H'mm-h'mm.

20  Q.    And now, what point in the conversation did he tell

21  you he was with Mike and Sun?

22  A.    After I got the phone back from the kids, because

23  when he asked for them I gave the phone to Davionne.

24  Davionne is my daughter by another guy, but when I met

25  Rat she was three months.  So that's who she know as her

26  daddy, "Rat."  So he asked to speak to Davionne.  He

27  spoke to her.  After he got off the phone with her, he

28  spoke to his daughter, which is Amyra, and Amyra gave me

29  the phone back, and that's when he told me I will meet

30  you back in the park if I make it back on that side.

31  And I was like, "Rat, what you doing across the river?

32  Who you with?"

51

162

1   Q.   So it was towards the end of the conversation?

2   A.   H'mm-h'mm.

3   Q.   Now, prior to the June 7 of 2009, did you know

4   Michael Treaudo?

5   A.   Did I know him?  Yeah.

6   Q.   How long did you know him?

7   A.   All my life.

8   Q.   What about Michael Allen?

9   A.   I knew Michael Allen, too.

10  Q.   How long did you know him for?

11  A.   I want to say about probably five, six years.  Just

12  I know him from the neighborhood, him moving down in the

13  Cut Off.  But I don't know him like -- I can say I know

14  him.

15  Q.   Did Michael Allen and Michael Treaudo stay in the

16  same neighborhood you were living in?

17  A.   H'mm-h'mm.

18  Q.   Did you often see Michael Allen and Michael Treaudo

19  together?

20  A.   Yeah.

21  Q.   How often would --

22  A.   All the time.

23  Q.   So is it fair to say when you would see one of them

24  you would see the other?

25  A.   Yeah.

26  Q.   Lamyra, were you living in Algiers in 2004?

27  A.   Yeah.

28  Q.   Now, that summer, did you learn of an incident

29  between Michael Allen and Arthur Lee Brown?

30  A.   Yeah.

31  Q.   What was that incident?

32       MR. MALVEAU:

163

1          Judge, objection.  That's hearsay of

2    what she learned.  It's all hearsay.

3    MR. NAPOLI:

4          Judge, may we approach?

5    THE COURT:

6          Yes.

7          (Bench Conference)

8    EXAMINATION BY MR. NAPOLI:

9    Q.   Lamyra, in the summer of 2004, to your own

10   knowledge, were Arthur and Michael on good terms or bad

11   terms?

12   MR. MALVEAU:

13          Objection to the vagueness --

14   THE COURT:

15          Overruled.

16          You may answer the question.

17   THE WITNESS:

18          Michael and Rat didn't see eye-to-eye.

19          I don't know if they were beefing or what.

20          They were not friends.  They didn't be

21          together.

22   EXAMINATION BY MR. NAPOLI:

23   Q.   Now on July 11 of 2004, was there a party at a

24   man's house named "Okeefe Brown"?

25   A.   There was a outside party, a DJ at the house.

26   Q.   Was Arthur related to Okeefe Brown?

27   A.   That's his uncle.

28   Q.   In 2004, where was Arthur staying?

29   A.   Well, we were actually staying on the left hand

30   side under a tree.

31   Q.   Where was he living in the summer --

32   A.   Oh, living on Kent Street.

53

1.64

1  Q.   With Okeefe Brown?

2  A.   Yes.

3  Q.   You said you were at this party.  Was Arthur also

4  present at this party?

5  A.   H'mm-h'mm.

6  Q.   Can you describe for the members of the jury what

7  took place at that jury?

8  A.   All I can tell you they had a car coming down the

9  street and shooting coming from the car.  All I did was

10 just ran and got into a cover until the car left.

11 Q.   What kind of car was it?

12 A.   I don't know.  I don't know what kind of car it

13 was.  I can't remember.  I didn't even try to see what

14 kind of car it was.

15 Q.   Did you see any of the people that were inside that

16 car?

17 A.   Yeah, I saw -- I saw one of them in the car.  I

18 know I saw one.

19 Q.   Who is that one?

20 A.   Michael Allen was in the car.

21 Q.   This car you're talking about, is this the car the

22 shooting is coming from?

23 A.   Yeah.

24 Q.   Now, Lamyra, you are not allowed to go into what

25 people told you.  Without saying what anyone told you,

26 do you know the reason behind that shooting?

27 A.   Yeah, because of Rat Rat.

28      MR. MALVEAU:

29           Judge, objection.

30 EXAMINATION BY MR. NAPOLI:

31 Q.   Just "yes" or "no."  Do you know the reason behind

32 the shooting?

165

1  A.    No, I don't know.

2       MR. NAPOLI:

3            I have nothing further.

4            - CROSS-EXAMINATION -

5  BY MR. MALVEAU:

6  Q.    Miss Henry, I want to ask you about the shooting

7  that the D.A. was asking you about.  And I will ask you

8  only about what you saw and I will ask you about where

9  you are standing and everything else, okay?

10 A.    Okay.

11 Q.    Now, I've asked you some questions about the

12 shooting before, right?

13 A.    Yes.

14 Q.    And I believe you told me the shooting was

15 supposedly towards the opposite side of the street you

16 were on?

17 A.    It was.

18 Q.    So you and Arthur Brown were standing together?

19 A.    Yeah.

20 Q.    And y'all were across the street from where his

21 Uncle Okeefe's house was?

22 A.    Yeah.

23 Q.    So when the shooting took place it was directed

24 away from where you and Arthur Brown were standing?

25 A.    Yes.

26 Q.    And you were not shot or anything?

27 A.    No.

28 Q.    And Arthur Brown was not shot, right?

29 A.    No.

30 Q.    And about the Michael Allen part, did you ever go

31 to the police and say Michael Allen was involved in this

32 shooting?

166

1   A.   No.

2   Q.   And you just said -- the D.A. asked you a question

3   about whether or not you knew the reason for the

4   shooting and you said no, correct?

5   A.   No, I don't know.

6   Q.   But what you do know is that you and Arthur Brown

7   -- you knew him as "Rat Rat" -- were across the street

8   from where the shooting was taking place?

9   A.   Uh-huh.

10  Q.   I want to ask you about that phone call now, okay?

11  A.   H'mm-h'mm.

12  Q.   Now, you said that Arthur Brown -- or "Rat Rat" --

13  called you earlier that morning around nine, you said?

14  A.   Yeah.

15  Q.   And that was a missed call?

16  A.   H'mm-h'mm.

17  Q.   And then he called you later on in the afternoon,

18  right?

19  A.   No, I called him.

20  Q.   You called him?

21  A.   I called him when I woke up.  That's something

22  regular family do.  He called me every morning, every

23  night.  That's something regular family do.

24  Q.   And you got on the phone and he was asking about

25  talking to his daughter with you, right?

26  A.   H'mm-h'mm.

27  Q.   And the other daughter that you had that you were

28  he was sort taking care of too, right?

29  A.   Yes.

30  Q.   And he wanted to speak to them?

31  A.   Right.

32  Q.   And during the course of that conversation he also

56

167

1  told you he was going to meet you at the park back

2  across the West Bank?

3  A.    Yes.

4  Q.    You and the kids, right?

5  A.    Well, he was supposed to just meet me in the park.

6  Q.    And he owed you money?

7  A.    Yeah.

8  Q.    So you definitely wanted to see him that day,

9  right?

10  A.    Yeah, I wanted to see him.

11  Q.    Now, in reference to the phone call, you said you

12  asked him who he was with, right?

13  A.    H'mm-h'mm.

14  Q.    And you said -- he said he was with "Sun," right?

15  A.    H'mm-h'mm.

16  Q.    Did he say "Mike," too, or just "Sun"?

17  A.    I asked him the second time because -- well, I

18  heard what he said, but it was kind of odd, so I said,

19  "Who you with?"  He said, "I'm with Sun and Mike."

20  Q.    Now, as far as Sun and Mike, it might seem like a

21  stupid question, but you were not in the car with them?

22  A.    No.

23  Q.    Because it's a phone call, right?

24  A.    Right.

25  Q.    And so you don't know who was in the car, right?

26  A.    Unh-unh.

27  Q.    Now when the detective came and showed you the

28  lineups, did they show it to you at police headquarters?

29  A.    Yeah, that's where they showed me at.  That's where

30  they showed me the pictures at, at headquarters.

31  Q.    At Police Headquarters, the homicide office?

32  A.    Yeah.

168

1    Q.    When they showed you the pictures, did they say

2    point out Michael Treaudo and Michael Allen?

3    A.    No, actually, they told me:  "Who is Sun?"  Like

4    you know, "Who is Sun?"  Who do I know as "Sun"?  And I

5    pointed at the picture.

6    Q.    Right --

7    A.    He didn't say, "Michael Treaudo."  He said, "Sun."

8    Q.    And he said who you know as "Mike"?

9    A.    Yes.

10   Q.    And that's when you pointed out Michael Allen?

11   A.    H'mm-h'mm.

12   Q.    When you picked those people out, you didn't know

13   if those people were actually in the car with Arthur?

14   A.    From what he said, yeah.

15   Q.    I got what you saying, but you don't --

16   A.    No, I don't.

17   Q.    Right, because you were not in the car?

18   A.    No, I was not.

19   Q.    It could have been anybody in that car, right?

20   A.    From the two names he said, they couldn't have been

21   anybody.

22   Q.    So there is only one "Mike"?

23   A.    One "Sun."

24   Q.    Only one "Sun," but there are many "Mikes"?

25   A.    Yeah, they got many "Mikes."

26   Q.    And you said the person you knew as "Sun" was

27   Michael Treaudo?

28   A.    Right.

29   Q.    Do you remember testifying in this case before at

30   the trial of Michael Treaudo?

31   A.    Yeah.

32   Q.    And the D.A. asked you some questions regarding

58

169

1    this case, too, then; right?

2    A.    Yes.

3    Q.    Different District Attorneys, though, right?  Do

4    you remember them asking you about the phone call you

5    had with Arthur Brown?  Do you remember that?

6    A.    Yeah.

7    Q.    And do you remember when you were asked who did

8    Arthur Brown -- as you referred to him as "Rat Rat" --

9    was in the car with, do you remember saying he was with

10   "Sun" and that "Sun" was Michael Treaudo, and not

11   mentioning Michael Allen at all?  Do you remember that?

12   A.    I remember saying he was with Sun because they

13   asked me, "Who is Sun?"  Like in the neighborhood, who

14   you would say "Sun" is, and I said, "Michael Treaudo."

15   Q.    But at the previous trial of Michael Treaudo, you

16   didn't mention anything about Michael Allen, right?

17   A.    No, I didn't mention anything about Michael Allen.

18   Q.    Right.  So when you were asked about who was in the

19   car at the trial of Michael Treaudo, you said that "Sun"

20   was in the car, correct?

21   A.    Yeah.

22   Q.    And you knew that "Sun" was Michael Treaudo, right?

23   A.    H'mm-h'mm.

24   Q.    You never mentioned anything about Mike or Michael

25   Allen, right?

26   A.    No.

27   Q.    Nothing about Big Mike or anything like that?

28   A.    No.

29   Q.    Nothing about Big Stank either?

30   A.    No.

31   Q.    None of that stuff?

32   A.    No.

1   Q.   Now, when the D.A. asked you about how long it was

2   after you heard -- you were on the phone with Arthur

3   Brown and you said that it seemed like minutes

4   afterwards you were told that he had been killed, right?

5   A.   H'mm-h'mm.

6   Q.   You sure it was minutes, or it could have been

7   longer, or you just don't remember too well?

8   A.   It was right after because my mom screamed.  He had

9   to be killed like right afterwards.  When that white boy

10  came and told me it was like 10 or 20 minutes later.

11  Q.   So it was about 20 minutes later you found out?

12  A.   H'mm-h'mm.

13  Q.   And I remember you were asked this question at the

14  last trial.  When you were on the phone with Arthur

15  Brown, or as you say, "Rat Rat," I believe you said that

16  nothing seemed to be out of the ordinary for you?

17  A.   Nope.

18  Q.   And it was not as if he was on the phone -- you

19  didn't get the inclination from the phone call that

20  something bad was about to happen?

21  A.   No.

22  Q.   And he also indicated to you that he was -- wanted

23  to come back on the West Bank and meet up with you and

24  the kids, right?

25  A.   Yeah.

26       MR. MALVEAU:

27               That's it, Judge.

28               - REDIRECT EXAMINATION -

29  BY MR. NAPOLI:

30  Q.   Lamyra, you previously testified at the trial of

31  Michael Treaudo, is that right?

32  A.   H'mm-h'mm.

171

1    Q.    June 10.

2          MR. COLLINS:

3                Thank you for your time, Detective.   I

4          will tender the witness.

5                    - CROSS-EXAMINATION -

6    BY MR. MALVEAU:

7    Q.    I have a few questions.   First I want to talk to

8    you about -- well, one so-called witness and one actual

9    witness of this alleged crime.   First, I want to talk to

10   you about this so-called witness, which was Miss Lamyra

11   Henry, okay?

12   A.    Okay.

13   Q.    Now, Miss Henry that day never saw Michael Treaudo

14   or Michael Allen with Arthur Brown, correct?

15   A.    Correct.

16   Q.    She never saw Arthur Brown, Michael Treaudo or

17   Michael Allen in a blue Tahoe together, correct?

18   A.    Never saw, no.   That's correct.

19   Q.    So, when you indicate she is a witness, she didn't

20   actually see anything related to this crime, would that

21   be fair to say?

22   A.    The purpose of that lineup was to establish who the

23   victim was with at 12:17 at the time of the murder.   She

24   was able to confirm that the victim was with Michael

25   Allen and Michael Treaudo.   That was the purpose of that

26   lineup.

27   Q.    I see what you are saying, but the fact of the

28   matter she didn't see who was in the car, so there is no

29   way for her to know who was in the vehicle, correct?

30   A.    Yes, that's correct.

31   Q.    All right.   So when she makes those IDs, she makes

32   IDs about who she thought was in the car with Arthur

103

172

1    Brown, correct?

2    A.    She made those IDs based upon what the victim was

3    telling her on her cell phone.

4    Q.    Right, but no one said Michael Allen or Michael

5    Treaudo, correct?

6    A.    The victim said "I'm with Sun and Mike."

7    Q.    Correct.  So, "Mike" and "Sun" would be classified

8    as nicknames or short names, correct?

9    A.    Correct for Michael Allen and Michael Treaudo.

10    Q.    But if she was not in there and didn't see

11    anything, how did she know it was Michael Allen and

12    Michael Treaudo?  That's my point.

13    A.    She didn't see.  I agree with you she didn't see.

14    The purpose of that lineup is what she was told by the

15    deceased.

16    Q.    Correct.  But you showed her two lineups and she

17    made what purports to be an identification, correct?

18    A.    That is right.

19    Q.    How can she make an identification of someone she

20    never saw?

21    A.    I answered you.

22        THE COURT:

23            This is redundant.

24        MR. MALVEAU:

25            I think the answer is "no" --

26        THE COURT:

27            I think the witness is responsive.

28        MR. MALVEAU:

29            That's why I referred to it as a

30        "so-called witness."

31    EXAMINATION BY MR. MALVEAU:

32    Q.    Let's talk about the real witness the person that

104

173

1   saw something, Yolanda Merritt?

2   A.   Yes.

3   Q.   And Miss Merritt lived in the neighborhood where

4   the murder took place, correct?

5   A.   Correct.

6   Q.   And you spoke to her the day after the murder?

7   A.   Yes, sir.

8   Q.   And you brought her two lineups, right?

9   A.   Yes.

10   Q.   And one of those lineups included Michael Treaudo?

11   A.   Yes.

12   Q.   And one of those lineups included Michael Allen,

13   correct?

14   A.   Correct.

15   Q.   .And Miss Merritt is a individual who actually saw

16   the two people who were in the blue Tahoe shortly after

17   the murder, correct?

18   A.   Yes, she saw the two people, correct.

19   Q.   And she made an identification of Michael Treaudo?

20   A.   That's correct.

21   Q.   And she did not make an identification of Michael

22   Allen, right?

23   A.   That's correct.

24   Q.   And this is the lady on the scene who actually saw

25   the alleged perpetrator fleeing the scene, correct?

26   A.   Yes, sir.

27   Q.   You also spoke to a Nicole Jackson, correct?

28   A.   Correct.

29   Q.   And Nicole Jackson was the mother of one of Arthur

30   Brown's children, correct?

31   A.   Yes, sir.

32   Q.   And after you left the scene on Red Maple you went

105

174

1    to Nicole Jackson's residence?

2    A.   Yes.

3    Q.  And Nicole Jackson, you learned from her that

4    Michael Treaudo was the person that came to pick up

5    Arthur Brown from her home, correct?

6    A.   Yes.

7    Q.  Michael Allen was not seen at the residence of

8    Nicole Jackson, correct?

9    A.   Not by Nicole Jackson.

10   Q.  By anybody else?

11   A.   No, sir.

12   Q.  You also said that you -- you didn't say on Direct,

13   but some evidence was retrieved in relation to Michael

14   Allen, some Timberland boots?

15   A.   Michael Allen?

16   Q.  Yes, Michael Allen.  And you retrieved those boots

17   because you wanted them tested for a possibility of any

18   blood evidence, correct?

19   A.   Correct.

20   Q.  And that's because the information you received

21   that supposedly Michael Allen wore Timberland boots

22   during the murder?

23   A.   Yes, sir.

24   Q.  And the results of those blood tests came back

25   negative?

26   A.   The red substance found was not blood on the

27   Timberland boots.

28   Q.  You also stated on Direct there were fingerprints

29   found both inside and outside of the Chevy Tahoe,

30   correct?

31   A.   Yes, sir.

32   Q.  Believe it's around 23 prints, right?

175

1   A.   Yes.

2   Q.   And you indicated that no prints came back matched

3   to Treaudo, correct?

4   A.   Correct.

5   Q.   Michael Allen, correct?

6   A.   Correct.

7   Q.   And Arthur Brown?

8   A.   Correct.

9   Q.   Were you aware if the prints came back to anyone

10  else besides those three individuals?

11  A.   Yes.  I don't remember the names, though.

12  Q.   So, there were print matches that were made inside

13  the blue Chevy Tahoe, correct?

14  A.   Yes, mostly from the exterior.

15  Q.   Did you do any investigation to the individuals

16  that came back as having their prints on their Chevy

17  Tahoe?

18  A.   No, they were never developed as suspects.

19  Q.   Did you investigate those individuals that had the

20  prints on the outside of the Chevy Tahoe?

21  A.   No, they were never developed as the suspects.

22  Q.   I understand where you are going with me.  But did

23  you do any investigation to tell me whether they had any

24  involvement?  Did you go to them and speak to them, to

25  their relatives?  Did you do any of that kind of stuff?

26  A.   No, they were not persons of interest.

27  Q.   So you just basically ignored them?

28  A.   I didn't say that.

29  Q.   You didn't do anything, right?

30  A.   I didn't say that either.

31  Q.   What did you do then?

32  A.   My investigation led me to Michael Allen and

176

1   Michael Treaudo, not the other six men.

2   Q.   I got you.  I understand exactly where you are

3   going with me.  That's not my question.  My question is

4   did you do any work, any investigation to determine

5   whether or not any of those people had anything to do

6   with this murder?

7   A.   No, they were not suspects.

8   Q.   So you ignored them, right?

9   A.   I didn't ignore anything.

10   Q.   If you didn't do anything that's ignoring it,

11   right?

12      MR. COLLINS:

13          Judge, it's argumentive.

14      THE COURT:

15          It is.  Move on.

16   EXAMINATION BY MR. MALVEAU:

17   Q.   Miss Merritt was the only witness that you

18   identified to -- well, I wouldn't say the murder, but

19   the only person in the area who could make an

20   identification, right, Miss Merritt?

21   A.   The scene, yes.

22   Q.   On the scene in the area of the murder, was she the

23   only witness you located?

24   A.   She was the only witness on the scene, yes.

25   Q.   There was no one else that made any identification

26   that lived in Red Maple or New Hampshire, anywhere in

27   that cul de sac area?

28   A.   That's correct.  She was the only witness in that

29   area.

30   Q.   Did you locate any relevant evidence at the Adrian

31   Street address you have attached to Michael Allen?

32   A.   A white T-shirt and a another set of boots with a

108

*177*

1   red substance.  Documents with his name showing what --

2   establishing he lived there and an ID.

3   Q.    And those were the boots you recovered that didn't

4   have blood on them, correct?

5   A.    There were two, one he was arrested with a red

6   substance and as the other boots from the house with a

7   red substance --

8   Q.    Neither one -- I'm sorry.

9   A.    Go ahead.

10  Q.    Neither one of those boots came back as having the

11  presence of blood, correct?

12  A.    Correct.

13  Q.    Did you swab those boots for any possible DNA to be

14  attached to Arthur Lee Brown?

15  A.    Yes.

16  Q.    What were the results of that?

17  A.    There was no human DNA on those boots.

18  Q.    If I'm correct, the story that -- strike that

19  question.  Arthur Brown was found not inside the

20  vehicle, but outside on the pavement, correct?

21  A.    Yes, sir.

22  Q.    To cover all bases, that white T-shirt you

23  recovered, there was no evidence you could retrieve,

24  physical evidence that could be tested taken from the

25  white T-shirt you retrieved at the Adrian residence,

26  correct?

27  A.    Correct.

28  Q.    So I'm correct in saying that there was no physical

29  evidence that you could find that would connect Michael

30  Allen to the murder of Arthur Brown; physical evidence?

31  A.    Aside from witness statements, no physical

32  evidence.

178

```
1        MR. MALVEAU:

2             That's all, Judge.

3        THE COURT:

4             Any Redirect?

5        MR. COLLINS:

6             Briefly, Judge.  Thank you.

7             - REDIRECT EXAMINATION -

8   BY MR. COLLINS:

9   Q.    Now, Detective, on Cross-Examination you were asked

10  about the lineups that you showed Lamyra Henry.  Do you

11  remember?

12  A.    Yes, I remember.

13  Q.    And specifically you were asked about -- I guess,

14  why you showed these lineups to Miss Henry?

15  A.    Yes.

16  Q.    And what specifically she told you, which came out

17  on Cross-Examination, what specifically she told you

18  that led you to show her these lineups?

19  A.    Through my investigation I learned that this was

20  the last person that the victim spoke at 12:17.  I was

21  able to confirm that the victim was definitely alive at

22  that time speaking with Lamyra Henry.

23  Q.    So at 12:17, you confirmed through the phone that

24  the victim was speaking to Lamyra Henry?

25  A.    Yes.

26  Q.    Okay.  And Lamyra Henry told you what about what

27  the victim told her?

28  A.    Through my investigation I heard that the victim

29  was somewhere in New Orleans East with "Sun and Mike,"

30  who she identified as Michael Treaudo and Michael Allen.

31  Q.    Okay.  Now when we are talking Lamyra Henry, how

32  long had she known the victim, the deceased?
```

110

*179*

1    MR. MALVEAU:

2         Objection.  This is all hearsay.

3    THE COURT:

4         Sustained.

5  EXAMINATION BY MR. COLLINS:

6  Q.   Well, detective did she give you a frame of

7  reference as to how she knew "Sun and Mike" as Michael

8  Allen and Michael Treaudo?

9  A.   She didn't say how, she just knew them.  She knew

10  their full names and from the neighborhood, from the

11  Algiers neighborhood.

12  Q.   And when you met with Miss Henry -- and I will show

13  you these two exhibits which have already be admitted --

14  what time, what day or where did you show Miss Henry

15  those lineups?

16  A.   This was June 8, the next day.  This was in front

17  of her home at 3:58 and 4:00 P.M.

18  Q.   Where does she live?

19  A.   Algiers.

20  Q.   I'm showing you the lineup, State's Exhibit 6, the

21  lineup you showed to Nicole Jackson.  Where and when did

22  show that lineup to Miss Jackson?

23  A.   At her home which was also in Algiers.

24  Q.   Okay.  But Miss Henry and Miss Jackson did not live

25  together?

26  A.   That's correct.

27    MR. COLLINS:

28         Thank you, Detective.

29         That's all I have, Judge.

30    THE COURT:

31         Thank you, Detective.  You may step

32    down.

111

180