# APPENDIX "H-2"

## THE HEARING ON THE MOTION TO SUPPRESS
## THE IDENTIFICATION AND EVIDENCE

### PAGES 4-102[2]

---

2   Renumbered here as Pages 182 to 281.

181

## DIRECT EXAMINATION

BY MS. AFRICK:

     Q    Good morning, Detective. Could you please state your name, occupation and assignment for the record?

     A    Kevin Burns, Jr., NOPD, Homicide.

     Q    And, Det. Burns, how long have you been with the New Orleans Police Department?

     A    Ten years.

     Q    How long have you been assigned to the Homicide Division?

     A    Three.

     Q    Three years?

     A    Yes, ma'am.

     Q    Were you so assigned on June 7th, of 2009?

     A    Yes.

     Q    On that date, June 7th of 2009, did you have the occasion to participate in the investigation of a homicide?

     A    Yes, I did.

     Q    How did your investigation into that homicide begin?

     A    On that Sunday, I received a phone call from Homicide Supervisor Joseph Catalanotto. He advised me of the location, it was 5700 Red Maple.

     Q    And once you learned the location of 5700 Red Maple, what did you do?

     A    Once I arrived, Det. Richard Chambers was assisting me until I arrived

182

1    with documenting the scene, that consisted of

2    locating witnesses and evidence on the scene,

3    gaining certain facts relative to the case

4    until I arrived.  Once I arrived on the

5    scene, I observed -- I first met with

6    Det. Chambers.  He had advised me that

7    witnesses were located on the scene.  He

8    advised me that a cell phone was located on

9    the scene.  And he also provided me with a

10   partial license plate of a SUV, the last

11   three numbers being 709.

12        Q    At the time that you received the

13   partial plate on the SUV, did you also have a

14   possible color of the SUV?

15        A    Blue green.

16        Q    Now you said when you arrived on

17   the scene there was a cell phone and some

18   other items on the scene.  Was there a body

19   on the scene?

20        A    Yes.  Like I said, this is what

21   Det. Chambers had advised me, once again,

22   like a brief gist of what had taken place

23   before I arrived.  I entered the crime scene

24   and that's where I observed the body of a

25   young  black male bleeding heavily from the

26   head and there was a large pool of blood near

27   his body.

28        Q    Now you stated that there was a

29   cell phone on the scene.  What, if anything,

30   occurred in regards to the cell phone?

31        A    After the Coroner's Office

32   conducted their investigation, they didn't

183

```
 1    find any identification on the victim at that
 2    time.
 3         Q    So, at that point, you did not
 4    know who the victim was?
 5         A    I did not.  So I took the cell
 6    phone from Det. Chambers, who was securing it
 7    for me.  I started to go through the call log
 8    -- I'm sorry, I went through the favorite
 9    five.
10         Q    At that time, did you have reason
11    to believe that this cell phone belonged to
12    the victim?
13         A    I had no idea.  I didn't know if
14    it was for a perpetrator or if it was for the
15    victim.
16         Q    Where was the cell phone found in
17    relation to the body of the victim?
18         A    In close proximity.
19         Q    You stated when you picked up the
20    phone, you started to look in the favorite
21    five list?
22         A    Yes.
23         Q    What did you do once you looked
24    in the favorite five list?
25         A    I called the first number that I
26    located in the favorite five.  A person
27    answered on the line.  When that person
28    answered, I asked them who the phone belonged
29    to.
30         Q    Now, the person that answered the
31    phone, were they able to identify who the
32    phone belonged to?
```

184

1     A    Yes.  She identified him by
2  nickname as Rat Rat (Phonetic) and then he
3  was identified with his full name as
4  Arthur Brown.  I was also provided with
5  descriptions of tattoos, the outfit that he
6  was wearing and it was consistent with what I
7  was observing at the time.
8     Q    Now, we'll call this person for
9  purposes of the motion hearing, the favorite
10  five person.  Did you ever have the occasion
11  to meet with this favorite five person?
12     A    Yes.  After the scene was
13  concluded, I relocated to that person's
14  residence.  When I spoke with that person,
15  that person told me that the victim had just
16  left with a gentleman named Michael Treaudo.
17     Q    So this person in the favorite
18  five said that the victim, Rat Rat or Arthur
19  Brown, had just left with Michael Treaudo?
20     A  ·  Correct.
21     Q    Did this favorite five person
22  give you any more information?
23     A    They gave me the color, it was a
24  blue green Tahoe SUV.
25     Q    Is that the vehicle that this
26  favorite five person observed the victim
27  leave in?
28     A    Yes, ma'am.  Also, while I was
29  standing up by the favorite five person's
30  residence, other individuals were present,
31  but they refused to give me their names and
32  identification.  However, they gave me

7

185

1  information that when the Tahoe arrived at
2  the residence, they observed a black male get
3  out of front and into the back seat.
4      Q    Was that black male that these
5  individuals were discussing with you
6  Michael Treaudo or someone in addition to
7  Michael Treaudo?
8      A    Someone in addition to
9  Michael Treaudo.
10     Q    What else did you learn, did you
11 learn anything else in regards to the blue
12 green SUV?
13     A    Yes, I did.  While I was there
14 also at that location, a second individual
15 arrived in a vehicle.  That second individual
16 said "I just talked to Rat Rat."  It was 1:00
17 and I told that person that that was me that
18 you were speaking with because I had the
19 victim's phone making phone calls.  I said,
20 that was not Rat Rat, that was me you were
21 speaking with.  And at that point I knew that
22 the victim was already dead at 1:00.  That
23 person drove away.
24          The favorite five person was able
25 to provide me with the second's person
26 identity.  While I'm on the scene, I received
27 a lead from another homicide detective that
28 --
29     Q    What was that lead in regards to?
30     A    It concerned the Tahoe, the
31 Chevrolet Tahoe.
32     Q    What information did you receive

186

1  in regards to the SUV?

2       A    That detective advised me of the

3  name of the owner and the location where the

4  owner of the vehicle lived.  I relocated to

5  the owner of the Tahoe's residence.  I

6  knocked on the door.  I met with the owner of

7  the vehicle.

8       Q    What did you learn from speaking

9  with the owner of the vehicle?

10      A    I asked the owner what type of

11 vehicle did he or she own.  The person told

12 me, "I own a blue green Chevy Tahoe 2007."

13      Q    Did that person know their

14 license plate number?

15      A    Don't quote me on the alphabets,

16 but I believe it was RPF, definitely it was

17 709.

18      Q    And in regards to the numerical

19 portion of the license plate number, is that

20 the same numerical portion that you had

21 previously received information about?

22      A    Yes.

23      Q    Did the owner of the vehicle

24 state where the vehicle was at that time?

25      A    The owner did not know where it

26 was located, but she knew -- he or she knew

27 who was in possession of the vehicle.

28      Q    And who was in possession of the

29 vehicle?

30      A    She identified the individuals as

31 Son and Mike.  And I asker her who was son

32 and she that was "Little Mike or

*187*

9

1   Michael Treaudo."  And I asked her who was
2   Mike and she said "Michael Allen."
3          Q     And how did those individuals
4   come to be in possession of the blue green
5   SUV?
6          A     The owner advised me that they
7   had borrowed the vehicle earlier that day.
8          Q     What, if anything else, did you
9   learn from the owner of the vehicle?
10         A     While speaking with the owner he
11  or she stated, "I'm going to place a phone
12  call to Michael Treaudo because he's in
13  possession of my second cell phone."  The
14  phone call was made to Treaudo.  I kind of
15  listened as she spoke to Treaudo demanding to
16  know where her vehicle was.  Treaudo stated
17  that the vehicle was by his sister's house
18  and he wasn't coming back to the cutoff and
19  that his sister would return the vehicle and
20  terminated the conversation.
21         Q     So what did you and the owner of
22  the vehicle do after that?
23         A     The owner asked me would I take
24  he or she to the vehicle.  We arrived --
25  well, I agreed and we drove to the 400 block
26  of whitney.
27         Q     Now, why did you go to the 400
28  block of Whitney?
29         A     Because she had learned that the
30  vehicle was somewhere around
31  Michael Treaudo's sister's residence.
32         Q     Were you able to locate the

10

188

1   vehicle when you arrived in the 400 block of
2   Whitney?
3        A     Well, when I arrived in the 400
4   block of Whitney, the owner pointed to an
5   apartment complex and stated that Treaudo's
6   sisters live somewhere in there, but didn't
7   know the apartment number.  So after about
8   less than five minutes, we drove around the
9   neighborhood and about two blocks from the
10  400 block of Whitney, we located a blue green
11  Tahoe at an abandoned parking lot at Alex and
12  Leboeuf Street.
13       Q     Did the owner of the vehicle
14  advised that as his or her vehicle?
15       A     Yes.
16       Q     What did you do after that?
17       A     I didn't approach the vehicle
18  because -- for safety reasons, I had the
19  owner with me, so I left the owner behind.  I
20  kind of visually scanned it and returned to
21  my vehicle.  At that time, I was able to
22  visually see the license plate was the same
23  as the license plate I was provided with by
24  the owner and the last three from the
25  witnesses on the scene.  I returned to my
26  vehicle and I asked two other homicide
27  detectives to take the owner of the vehicle
28  away from the scene, away from danger and
29  relocate the owner to the Homicide Office for
30  a follow-up interview.
31            I stayed with the vehicle and I
32  asked for assistance from four district

11

189

1    officers to wait with me until a tow truck
2    arrived and we could clear the vehicle to
3    make sure any bottles wasn't in there,
4    suspects, et cetera wasn't in the vehicle.
5    Once the tow truck arrived, we saw that there
6    was not any danger present in the vehicle, we
7    confiscated the vehicle and towed it to the
8    evidence cage at Police Headquarters.
9          Q      Did you ever have the occasion to
10   show a photographic lineup to the person you
11   were calling the favorite five person?
12         A      Yes.  I returned to the residence
13   of the favorite five person.  I prepared the
14   lineup that contained Micheal Treaudo and I
15   presented the person with it and that person
16   identified Michael Treaudo as the person that
17   entered the vehicle and drove away with the
18   victim right before he was killed.
19         Q      Where did you meet with the
20   favorite five person in regards to showing
21   that person the photographic lineup?
22         A      In Algiers.
23         Q      Was anyone else present when you
24   showed this person the photographic lineup?
25         A      My partner.
26         Q      Who was your partner?
27         A      Regina Williams.
28         Q      What do you recall saying to the
29   favorite five person prior to showing them
30   the photographic lineup?
31         A      Basically, this is a sheet of
32   people that contains six black males.  I

190

1   asked, could you show me the person that was
2   the driver of the vehicle and that took --
3   that left with Arthur Brown at the time.
4       Q      And was that person able to make
5   an identification?
6       A      Yes.
7       Q      Who did that person identify?
8       A      Michael Treaudo.
9       Q      Now did you promise this person
10  anything for making an identification?
11      A      No.
12      Q      Did you tell them that they had
13  to make an identification?
14      A      No.
15      Q      Did you suggest to them in any
16  way who to identify?
17      A      No.
18      Q      Did you force or coerce them into
19  making an identification?
20      A      No.
21  MS. AFRICK:
22              Let the record reflect I'm
23              showing Defense Counsel what I've
24              previously marked as State's
25              Exhibit 1.  May I approach, your
26              Honor?
27      THE COURT:
28              Yes.
29  BY MS. AFRICK:
30      Q      Officer, I'm handing you what
31  I've previously marked as State's Exhibit 1.
32  Can you identify what I just handed you?

191

1     A     This is a six-pack,
2  six-individual lineup, that I showed to the
3  favorite five person.  And Michael Treaudo is
4  featured in photograph number 1 in the upper
5  lefthand corner and that was the person that
6  that person identified.
7     Q     Did you have this person do
8  anything to the back of the photographic
9  lineup?
10     A     It was -- the name of that person
11  was signed, printed, dated and the time was
12  written on the back in box number 1.
13     MS. AFRICK:
14            Just a moment of the Court's
15            indulgence.  May we approach,
16            your Honor?
17     THE COURT:
18            Yes.
19       (DISCUSSION OFF THE RECORD.)
20     THE COURT:
21            Let's refer to the Side Bar.
22     MS. AFRICK:
23            Your Honor, at this time the
24            State has just approached the
25            Bench and requested that for the
26            remainder of the motion hearing
27            some of the people that we'll be
28            talking about are witnesses that
29            their identity at this time are
30            unknown to the Defense.  We are
31            asking to keep it that way in
32            order to protect their safety.

192

1       So, therefore, we are asking
2   this Court to -- we have the
3   photographic lineup present in
4   court.  We're asking that
5   Defense Counsel only view the
6   front of the photographic lineups
7   in regards to just the pictures
8   involved and not to the
9   signatures on the back, as that
10  would reveal the identity of the
11  witnesses.
12  THE COURT:
13      And how many lineups do you
14  have, photographic lineups, that
15  fall into that category?
16  MS. AFRICK:
17      I believe there are seven
18  more photographic lineups, Judge.
19  THE COURT:
20      Mr. Boggs?
21  MR. BOGGS:
22      Judge, we object strongly,
23  your Honor.  This is secreted
24  evidence against the defendant.
25  The Code provides the defendant
26  and Defense Counsel the right to
27  examine the evidence against
28  him.  Those identifications are
29  evidence against him.  Without
30  being able to examine them, it's
31  it is first off a violation of
32  the Code.  Second of all, it's a

193

1   violation of all rights of due
2   process, Judge.  Because what it
3   means is that it is secret
4   evidence.
5        Furthermore, there is no way
6   for the Court to rule on or for
7   the Defense to investigate or
8   cross-examine on the
9   suggestiveness or the reliability
10  of those identifications without
11  seeing a signature on the back.
12  We have no confirmation even that
13  an identification was made,
14  Judge.  It is the quintessential
15  -- this is the evidence against
16  him and he's being held secret.
17       I understand they're saying
18  to protect these individuals, but
19  there are far less extreme
20  measures than withholding
21  evidence and making evidence a
22  secret to protect their
23  witnesses.  They have all kinds
24  of witness protection programs.
25  They have many other things they
26  can do, first off.  Second,
27  Judge, we can do an in-camera
28  with you out of the presence of
29  the defendant.  We can go on the
30  record regarding -- with Defense
31  Counsel when we're dealing with
32  information.  There are many

194

1   other things we can do.

2   Furthermore, Judge, as I
3   understand it from the Side
4   Bar, the District Attorney Office
5   is afraid that someone in the
6   audience may hear the name and
7   something will happen.  I can
8   examine the evidence and we
9   can keep that name off of the
10  record so that nobody in the
11  audience will hear.

12  The next thing, Judge, is
13  that the only identification, as
14  I understand it that was made in
15  this concern my client, Mr.
16  Treaudo.  Mr. Treaudo, to our
17  knowledge, and I asked him to
18  stay in court room, does not have
19  a single person here, not a
20  single friend, not a single
21  family member.  When I told the
22  District Attorney's Office, they
23  said that they have public
24  defenders in the audience -- in
25  the room.  I don't understand,
26  are they suggesting the Public
27  Defenders Office is going to out
28  and threaten the safety of this
29  witness.

30  MS. AFRICK:

31  Your Honor, I think at this
32  time Defense Counsel's argument

195

1    moves far away from what is
2    actually at issue at the motion
3    hearing.  Under the Code of
4    Criminal Procedure, Article 703,
5    the Defense has the burden of
6    showing that this photo array was
7    suggestive and that there's a
8    substantial likelihood of
9    misidentification.  The witness'
10   identification, the witness'
11   actually name, in no way, goes to
12   either one of those things.
13        And, so, the Defense is not
14   inhibited in putting on their
15   case at motions in any way.  They
16   are allowed to view the
17   photographic lineup, they're
18   allowed to view their
19   suggestiveness, if any, to make
20   that argument.  They're allowed
21   to cross-examine the detective in
22   regards to whether or not this
23   person made an identification.
24   All we are asking at this point
25   is that this person's name not be
26   divulged in order to protect
27   their safety.
28   MR. BOGGS:
29        Judge, we cannot divulge
30   their name on the record.  We
31   cannot say it out loud.  It can
32   be in-camera and Defense can

18

196

```
1          still be allowed to see the backs
2          of those photographs, Judge.   I
3          cannot meet my burden under 703
4          when placed under that
5          restriction and that's quite
6          clear, Judge.
7       THE COURT:
8              Thank you.  The State's
9          motion is granted.  I want the
10         ruling to be clear, essentially
11         everything except the
12         individual's name is going to
13         be fair game for the Defense.
14         And I will note a Defense
15         objection for the record.
16      MR. MALVEAU:
17             Note my objection, too,
18         Judge.
19      THE COURT:
20             Noted.
21   BY MS. AFRICK:
22      Q    Now, Detective, I think we had
23   just spoken about the photographic lineup in
24   regards to the favorite five list.  At any
25   time did you have a chance to return to the
26   crime scene to canvass for witnesses?
27      A    Yes.
28      Q    While on the crime scene did you
29   locate any witnesses?
30      A    Two.
31      Q    Now we're going to talk about the
32   first scene witness.  This first scene
```

197

1   witness, what did this person observe?
2        A    This person -- like I said, when
3   I first arrived to the scene, I was given
4   some information by Det. Chambers.  I had
5   elected not to speak with the witness at that
6   time due to the presence of cameras and
7   onlookers.  This was the same individuals
8   that I had knowledge about.  We returned the
9   next morning and I spoke with scene witness
10  number 1.  Scene witness number 1 stated that
11  he or she observed what he or she believed to
12  be gunshots.  That person believed that it
13  wasn't as loud -- the volume wasn't typical.
14  He or she believed it possibly came from
15  inside of a vehicle.
16        When the witness looked out of
17  the window, he or she observed a blue green
18  Chevy Tahoe.  The driver was described as a
19  black male, small in size, wearing a white
20  T-shirt and being on a cell phone while
21  driving.  The passenger of the vehicle was
22  described as a black male.  As the vehicle
23  drove by he or she was able to get the last
24  three numbers of the license plate on that
25  vehicle, which was 709.  I realized at that
26  time this was the same person from the scene
27  that gave us a lead that day.
28        Q    Did you ever have the occasion to
29  show this person, scene witness number 1, any
30  photographic lineups?
31        A    Yes -- before I answer that, the
32  person also stated that they were holding

198

1   their cell phone and was able to give me a

2   closer, more accurate time of death.

3       Q    And what was that time?

4       A    I'm not sure.  It was 12

5   something.  I don't remember.  At that time I

6   had already had lineups prepared.  I showed a

7   lineup that contained Michael Allen.  Scene

8   witness number 1 could not make an

9   identification of Michael Allen.  I gave

10  scene witness number 1 the lineup that

11  contained Micheal Treaudo.  He or she stated

12  that Treaudo was the driver of the vehicle

13  that was observed leaving the scene and was

14  the person on the cell phone at the time.

15      Q    Now I want to take you back, you

16  stated that you showed this person a

17  photographic lineup.  Where were you when you

18  showed this person the photographic

19  lineup?

20      A    At that person's residence.

21      Q    Was anyone else present?

22      A    My partner.

23      Q    The same partner we discussed

24  previously?

25      A    Yes.

26      Q    Now, when you showed this person

27  the photographic lineup, what did you say to

28  this person prior to showing them the

29  photographic lineup?

30      A    I remember I kept it very simple.

31  I said, do you recognize anyone in this

32  lineup, and that's when I said for both.

21

199

1    Q    You stated that this person,
2  scene witness 1, identified Michael Treaudo?
3    A    Yes, as the driver.
4    Q    Did you promise scene witness 1
5  anything for making an identification?
6    A    No.
7    Q    Did you force or coerce scene
8  witness 1 into making an identification?
9    A    No.
10    Q    Did you suggest to this person in
11  any way who to identify?
12    A    No.
13    Q    Did you tell this person that
14  they had to make an identification?
15    A    I did not.
16    MS. AFRICK:
17        Let the record reflect that
18        I'm showing Defense Counsel the
19        front of what's marked as State's
20        Exhibit 2.  May I approach the
21        witness?
22    THE COURT:
23        Yes.
24  BY MS. AFRICK:
25    Q    Detective, I'm handing you what
26  I've previously marked as State's Exhibit 2.
27  Could you identify what I have just handed
28  you?
29    A    This is a lineup that contained
30  Michael Treaudo.  He's in box number 1, upper
31  lefthand corner.
32    Q    And is box number 1 the

200

1    photograph that scene witness 1 identified?

2         A    Yes, ma'am.

3         Q    Did you have scene witness 1 do

·4   anything to the back of the photographic

5    lineup?

6         A    His or her name is signed,

7    printed, the date and the time.

8         Q    Now, did you have the occasion to

9    meet with any other witnesses on the scene?

10        A    Yes.

11        Q    We'll call the next person that

12   you talked to scene witness 2.  Did you have

13   the occasion to show scene witness 2 any

14   photographic lineups?

15        A    Yes.

16        Q    Did scene witness 2 make any

17   identifications?

18        A    No.  Scene witness number 2 only

19   provided me with the number of shots and the

20   vehicle description.

21        Q    Did you ever have the occasion to

22   go back for information to the victim's cell

23   phone?

24        A    Yes.  I went through the victim's

25   call log.  I checked the incoming and

26   outgoing calls.  I tried to get the most

27   recent conversation closer to the time that I

28   was given by scene witness number 1.  As I

29   stated, scene witness number 1 gave me an

30   accurate time of -- that the shooting

31   occurred.  I went back to the phone to see

32   the most recent conversation that the victim

201

1    had.

2        Q     And was there a last call made

3    from the victim's cell phone?

4        A     Yes.

5        Q     Did you call the last number that

6    the victim had called from his cell phone?

7        A     Yes.

8        Q     And did you speak to someone?

9        A     Yes.

10       Q     We'll call that person for

11   purposes of the motion hearing last call

12   witness. Did you speak to the last call

13   witness?

14       A     Yes.

15       Q     What did you learn from speaking

16   to the last call witness?

17       A     When I spoke to that person, that

18   person told me that, "I talked to Rat Rat

19   right before was the killed." I asked that

20   person to check the call log. That person

21   checked and at that time that person stated

22   that, "I didn't talk to him at 1:00, I talked

23   to him at 12 something." At that time I

24   realized that that was the person who drove

25   away when I went to the favorite five's

26   house. We were able to understand that he or

27   she did not speak to the victim at 1:00 and

28   it was me. The actual time, which was in

29   close proximity to the time of death was

30   about 10 do 15 minutes prior to the victim

31   being shot. I remember now, scene witness

32   number 1 told me the time was 12:33. The

202

1   last call person stated the call was
2   terminated at 12:17.  So the victim was
3   confirmed to be alive, definitely, at 12:17.
4       Q      Did you learn from speaking to
5   the last call witness any information?
6       A      Yes.  During that conversation
7   between the last call person and the victim,
8   the last call person stated that it was odd
9   for the victim to contact he or she.  That
10  person felt that something was wrong.  The
11  victim went on to tell that person, "I'm
12  with Son and Mike.  I'm somewhere in New
13  Orleans East."  He said, "I'm going to come
14  get my daughter if I ever make it back."
15      Q      Did you ever have an opportunity
16  to speak with this person further about who
17  this person knew Son and Mike to be?
18      A      Yes.  After learning that, I
19  wanted to have an interview with this person.
20  We met and I showed her a lineup that
21  contained Michael Treaudo -- no, let me back
22  up.  I asked her for the full name of Son.
23  She identified him as Michael Treaudo.  And I
24  asked who was Mike.  He or she identified
25  Mike as Michael Allen.  I gave that person
26  lineups that contained both individuals.
27  That person identified Michael Allen and
28  Michael Treaudo as the two individuals the
29  victim was with in New Orleans East shortly
30  before the victim was killed during a phone
31  conversation.
32      MS. AFRICK:

203

1          At this time, I'm showing
2      Defense Counsel what I've
3      previously marked as State's
4      Exhibits 3 and 4.  May I approach
5      the witness, your Honor?
6   THE COURT:
7          Yes.
8   BY MS. AFRICK:
9      Q   Now, Detective, you stated that
10  you had the opportunity to show this person,
11  the last call person, two photographic
12  lineups?
13     A   Yes.
14     MS. AFRICK:
15         Let the record reflect, I'm
16         showing the Detective what I've
17         previously marked as State's
18         Exhibit 3.
19  BY MS. AFRICK:
20     Q   Can you identify what I've just
21  handed you?
22     A   This is a six-individual lineup.
23  Michael Treaudo is featured in box number 2,
24  upper center.
25     Q   And is that the person that the
26  last call witness identified?
27     A   Yes.
28     Q   Now, what did you say to the last
29  call witness before showing this person the
30  photographic lineups?
31     A   I asked, is this the person, Son,
32  that you were referring to that was -- that

204

1   the victim was in the vehicle with in New
2   Orleans East.
3           MS. AFRICK:
4                   Let the record reflect, I'm
5                   handing the Detective, what I've
6                   previously marked as State's
7                   Exhibit 4.
8   BY MS. AFRICK:
9           Q    Can you identify what I've just
10  handed you?
11          A    A six-individual lineup.  It has
12  Micheal Allen in the bottom center.
13          Q    Is that the photograph that the
14  last call witness identified?
15          A    Yes.
16          Q    Now, prior to showing these two
17  photographs to the last call witness, did you
18  promise -- or at any time, did you promise
19  the last call witness anything for making the
20  identification?
21          A    No.
22          Q    Did you suggest to this person in
23  any way who to identify?
24          A    No.
25          Q    Did you force or coerce them into
26  making an identification?
27          A    No.
28          Q    Did you tell them that they had
29  to make an identification?
30          A    No.
31          Q    Now in regards to both State's
32  Exhibit 3 and State's Exhibit 4, after the

205

1    last call witness identified the photographs,
2    did you have them do anything to the back of
3    the photographic lineups?
4         A    He or she signed, printed their
5    name, the date and the time.
6         Q    At any point did you have the
7    occasion to obtain arrest warrants for either
8    Michael Allen or Michael Treaudo?
9         A    Yes.  I prepared two arrest
10   warrants, one for both Michael Allen and
11   Treaudo for second degree murder.
12        Q    Did you have a magistrate
13   commissioner or judge sign these warrants?
14        A    Yes.
15   MS. AFRICK:
16             Let the record reflect I'm
17             showing Defense Counsel what I've
18             previously as State's Exhibits
19             5 and 6.  May I approach, your
20             Honor?
21   THE COURT:
22             Yes.
23   BY MS. AFRICK:
24        Q    Detective, I'm handing you what
25   I've previously marked as State's Exhibit 5.
26   Can you identify what I've just handed you?
27        A    This is an arrest warrant for
28   Michael Allen for second degree murder.
29        Q    And are you the affiant on the
30   warrant?
31        A    Yes.
32        Q    And does that warrant also

206

1   contain the signature of a magistrate
2   commissioner or district court judge?
3       A    Yes.
4       Q    Detective, I'm also handing you
5   what I've previously marked as State's
6   Exhibit 6.  Can you identify what I've just
7   handed you?
8       A    This is a warrant for Michael
9   Treaudo for second degree murder with the
10  signature of the judge on bottom.
11      Q    Now, at any point, did you have
12  the occasion to apply for search warrants in
13  regards to this case?
14      A    Yes.  I applied for a search
15  warrant for the blue green Tahoe, Michael
16  Allen's residence on Adrian Street and
17  Michael Treaudo's residence on Whitney.
18      Q    So, in total in this case, you
19  applied for three search warrants?
20      A    Yes.
21  MS. AFRICK:
22              Let the record reflect that
23              I'm showing Defense Counsel what
24              I've previously marked as State's
25              Exhibit as State's 7, in globo.
26              May I approach, your Honor?
27  THE COURT:
28              Yes.
29  BY MS. AFRICK:
30      Q    Detective, I'm handing you what
31  I've previously marked as State's Exhibit 7,
32  in globo.  Can you identify what I've just

29

207

1   handed you?

2       A   This is the search warrant for

3   the Chevrolet Tahoe.

4       Q   Now, does State's Exhibit 7, in

5   globo, contain the application and order for

6   search, as well as the return on the search

7   warrant?

8       A   Yes, it does.

9       Q   Are you the affiant on that

10   search warrant?

11       A   Yes.

12       Q   Did you have that search warrant

13   signed by a magistrate commissioner or

14   district court judge?

15       A   Yes.

16       Q   Did you ever have the occasion to

17   have the search warrant for the Chevy Tahoe

18   executed?

19       A   Yes.

20       Q   And in State's Exhibit 7, is

21   there a return on that warrant?

22       A   Yes.

23       Q   What was located or taken from

24   the Chevy Tahoe during the execution of the

25   warrant?

26       A   Seventeen prints, six palm

27   prints, one clear unknown substance, one

28   unknown reddish substance, one unknown brown

29   substance, one purple and white Children's

30   Place medium T-shirt with a with reddish

31   stain and one Empire England white T-shirt.

32       Q   You stated that you also had the

208

1   occasion to apply for a search warrant for
2   Adrian Street?

3        A    Yes.

4        Q    Why did you apply for a search
5   warrant to a location on Adrian Street?

6        A    That was Michael Allen's
7   residence.   My goal was to obtain any
8   evidence relative to the investigation.

9        MS. AFRICK:

10               Let the record reflect that
11            I'm showing Defense Counsel what
12            I've previously marked as State's
13            Exhibit 8, in globo.   May I
14            approach the witness, your
15            Honor?

16        THE COURT:

17               Yes.

18   BY MS. AFRICK:

19        Q    Detective, I'm handing you what
20   I've previously marked as State's Exhibit 8,
21   in globo.  Can you identify what I've just
22   handed you?

23        A    The is a search warrant for 3420
24   Adrian Street, along with a receipt, a return
25   of the things I confiscated from there.

26        Q    I want to take you, in regards to
27   State's Exhibit 8, to the application and
28   order of search.  Again, what is the address
29   that the search warrant refers to?

30        A    3420 Adrian Street.

31        Q    And are you the affiant on the
32   search warrant?

209

1    A    Yes.

2    Q    And did you have that search

3 warrant signed by a magistrate commissioner

4 or district court judge?

5    A    Yes.

6    Q    Did you ever have the occasion to

7 execute that search warrant or to have

8 someone execute that search warrant at 3420

9 Adrian Street?

10    A    Yes.

11    Q    What, if anything, was located

12 during the search of the Adrian Street

13 address?

14    A    Two photographs of Michael Allen,

15 one school identification for Micheal Allen,

16 a pair of Timberland boots with a reddish

17 substance on both boots and a white T-shirt.

18    Q    Now you stated that you also got

19 a search warrant for an address on Whitney;

20 is that correct?

21    A    Yes.

22    Q    Why did you get a search warrant

23 for this address on Whitney?

24    A    To obtain any evidence relative

25 to the investigation.

26    MS. AFRICK:

27        Let the record reflect that

28        I'm showing Defense Counsel what

29        I've previously marked as State's

30        Exhibit 9, in globo.  May I

31        approach the witness, your Honor?

52    THE COURT:

32

210

1        Yes.
2    BY MS. AFRICK:
3        Q    Detective, I'm handing you what
4    I've previously marked as State's Exhibit 9
5    in globo.  Can you identify what I've just
6    handed you?
7        A    I'm sorry?
8        Q    I've handed you what I've marked
9    as State's Exhibit 9, in globo.  Can you
10   identify what I've just handed you?
11       A    This is an application for search
12   warrant for Treaudo's residence, 437 Whitney.
13   It's signed by a magistrate judge and has a
14   receipt of the items seized from the
15   location.
16       Q    Are you the affiant on that
17   warrant?
18       A    Yes.
19       Q    Did you ever have the occasion to
20   have that warrant executed?
21       A    Yes.
22       Q    What, if anything, was found at
23   437 Whitney during the execution of the
24   warrant?
25       A    A white Cotton City T-shirt.
26       Q    Now, you previously stated that
27   you had the occasion to obtain an arrest
28   warrant for Michael Allen?
29       A    Yes.
30       Q    To your knowledge, was that
31   arrest warrant ever executed?
32       A    Yes.

211

1       Q    When Michael Allen was arrested,
2  was he taken to Homicide?

3       A    Yes, he was.

4       Q    At that time, did Michael Allen
5  elect to make any statements?

6       A    Yes -- I'm sorry, Michael Allen?

7       Q    Michael Allen.

8       A    Let me back up a little bit.
9  Michael Allen was arrested before the search
10  warrant, so Michael Allen was taken back to
11  the Homicide Office.  He was advised of his
12  rights.  He didn't make any statements.  I
13  noticed that he was wearing a pair of
14  Timberland boots and I confiscated his boots
15  and his currency and placed it on the books.

16       Q    At the time of his arrest you
17  said he was wearing some Timberland boots?

18       A    Yes.

19       Q    Why were those confiscated?

20       A    I noticed a liquid stain on the
21  top.  It was consistent in color of blood.

22       Q    Do you know if the arrest warrant
23  for Michael Treaudo was ever executed?

24       A    Yes.  We went to Whitney, 437
25  Whitney.  We executed the search.  He was not
26  present at the time.  Since then, I've
27  relocated to Adrian Street.  While I was on
28  Adrian Street, I learned that officers had
29  learned the whereabouts of Treaudo.  I was
30  provided with an address on Frenchmen Street.
31  I asked that Det. Gernon assist me until I
32  was able to arrive at the location.  Michael

212

1    Treaudo was arrested at the Frenchmen

2    location.

3        Q    And, I believe Det. Gernon is

4    here to testify. At any time did you have

5    the opportunity to meet with Michael Treaudo

6    after he was arrested at the Frenchmen Street

7    address?

8        A    Yes. I arrived on Frenchmen

9    Street. When I arrived, Michael Treaudo was

10    already in custody. I transported Michael

11    Treaudo back to the Homicide Office and I

12    asked that other homicide detectives document

13    the scene in my absence while I conducted my

14    interview.

15        Q    And where did you conduct your

16    interview of Michael Treaudo?

17        A    Police Headquarters.

18        Q    Now prior to interviewing

19    Michael Treaudo, did you read him his Miranda

20    rights?

21        A    Yes.

22        Q    Did you read his Miranda rights

23    from a card, from memory, a Rights of

24    Arrestee Form or something else?

25        A    I reads it from the Rights of

26    Arrestee Form.

27        MS. AFRICK:

28             Let the record reflect I'm

29             showing Defense Counsel what I've

30             previously marked as State's

31             Exhibit 10. May I approach the

32             witness?

213

```
 1          THE COURT:
 2                    Yes.
 3     BY MS. AFRICK:
 4          Q      Officer, I'm handing you what
 5     I've previously marked as State's Exhibit 10.
 6     Can you identify what I've just handed you?
 7          A      This is two Rights of Arrestee or
 8     Suspect Forms.  The first one was for
 9     Michael Allen from the previous date when he
10     didn't want to make any statements.
11          Q      Now I'll refer you to the second
12     one, the second one in regards to
13     Michael Treaudo.
14          A      The second one is for
15     Michael Treaudo.
16          Q      Now, is that the Rights of
17     Arrestee Form that you advised Mr. Treaudo of
18     his Miranda rights from?
19          A      Yes.
20          Q      Can you state those rights today
21     from that form as you remember reading them
22     to Michael Treaudo?
23          A      Yes.  I told him that I'm going
24     to advise him of his rights from a Rights of
25     Arrestee or Suspect Form number 250380.  The
26     date was Thursday, June 11, 2009, 7:01 p.m.
27     The item number was 871709.  The location 715
28     South Broad.  Do you want me to read the
29     whole thing or just get to the rights?
30          Q      If you could just read the
31     Miranda rights.
32          A      It states, "Michael Treaudo,
```

214

1   name; date of birth, 12/7/87, black male.
2   You are under arrest for alleged violation of
3   revised statute 19 50 as amended in Article
4   14 30.1, relative to second degree murder.
5   The possibility of your participation in
6   other crimes is also under investigation.
7   According to the provisions in the
8   Constitution of the United States and of the
9   State of Louisiana, it is my duty to inform
10  you that you need not make any statements.
11  That is, you have a right to remain silent,
12  anything you say may be used against you in
13  trial.  You have a right to consult with and
14  obtain the advise of an attorney before
15  answering any questions.  If you cannot
16  afford an attorney, the Court will obtain an
17  attorney to represent you and advise you.
18  You have a right to have your attorney or an
19  appointed attorney present at the time of any
20  questioning or giving of any statements.  Do
21  you understand what I have just read?"  And
22  he indicated, "yes."  He signed his name by
23  Signature of Arrestee or Suspect, waiving his
24  rights.
25       Q    You stated after you read his
26  Miranda rights, you said, did he understand
27  and you stated he indicated yes.   How did he
28  indicate yes?
29       A    There's a box that has yes or no
30  and yes is checked.
31       Q    Did he also sign that Rights of
32  Arrestee Form that I previously marked as

37

215

1    State's Exhibit 10?

2         A    Yes.

3         Q    Did you observe him sign it?

4         A    Yes.

5         Q    Do you see Michael Treaudo in

6    court today?

7         A    Yes, I do.

8         Q    Can you point him out and

9    describe something that he's wearing, for the

10   record?

11        A    The gentleman, short, brown skin,

12   small twists, orange suit.

13        Q    And, can you point out his

14   location in the courtroom?

15        A    Right there (indicating).

16   MS. AFRICK:

17             Let the record reflect that

18             the witness has identified the

19             defendant.

20   BY MS. AFRICK:

21        Q    Now after reading Michael Treaudo

22   his Miranda rights, did Mr. Treaudo elect to

23   make a statement?

24        A    Yes.

25        Q    Was that statement tape recorded?

26        A    Yes.

27        Q    Did you also make a -- was a

28   transcription also made of that statement?

29        A    Yes.

30        Q    Did you have an opportunity to

31   review that transcription and was it an

32   accurate depiction of what occurred during

216

1   the taped statement?

2          A     Yes.

3          MS. AFRICK:

4                  Let the record reflect that

5                  I'm showing Defense Counsel what

6                  I've previously marked as State's

7                  Exhibit 11.  May I approach the

8                  witness?

9          THE COURT:

10                 Yes.

11  BY MS. AFRICK:

12         Q     Detective, I'm handing you what

13  I've previously marked as State's Exhibit 11.

14  Can you identify what I've just handed you?

15         A     This is the typed transcript of

16  the conversation between Michael Allen and

17  Det. Burns.

18         Q     I'm sorry --

19         A     I'm sorry, Michael Treaudo and

20  Det. Burns.

21         Q     And you stated that you also

22  taped that statement?

23         A     Yes.

24         MS. AFRICK:

25                 Judge, at this time, would

26                 you like to review the transcript

27                 or hear the tape?

28         THE COURT:

29                 Any objection?

30         DEFENSE COUNSEL:

31                 No, Judge.

32         THE COURT:

217

```
 1                    Let's play it.
 2        MS. AFRICK:
 3                    Play the tape?
 4        THE COURT:
 5                    Yes.
 6        MS. AFRICK:
 7                    Your Honor, I'll marked the
 8               taped statement as State's
 9               Exhibit 12.
10        MR. BOGGS:
11                    Judge, may we approach?
12        THE COURT:
13                    Yes.
14   (Discussion off the record.  The tape is not
15   played in open court at this time.)
16   BY MS. AFRICK:
17        Q    Now, Detective, you stated that
18   Michael Treaudo elected to make a taped
19   statement to you?
20        A    Yes.
21        Q    At any time, did you force him
22   into making that statement?
23        A    No, I didn't.
24        Q    Did you promise him anything for
25   making that statement?
26        A    No.
27        Q    Did you threaten him into making
28   a statement?
29        A    I did not.
30        Q    Did Mr. Treaudo seem capable of
31   making a voluntary statement?
32        MR. BOGGS:
```

218

```
1                   Objection, legal conclusion,
2               your Honor.
3    BY MS. AFRICK:
4         Q    Did Mr. Treaudo seem sober?
5         A    Yes.
6         Q    Did Mr. Treaudo seem in control
7    of his faculties?
8         MR. BOGGS:
9               Judge, objection to the form
10              of the question.
11        THE COURT:
12              I'll overrule it.  You can
13              answer the question.
14   BY MS. AFRICK:
15        Q    Did Mr. Treaudo seem in control
16   of his faculties?
17        A    Yes.
18        Q    The Court is going to listen to
19   the taped statement in chambers.  During the
20   course of the taped statement we hear a noise
21   on the tape, do you know what noise I'm
22   speaking of?
23        A    Yes, I do.
24        Q    What is that noise on the tape?
25        A    Treaudo was dry heaving.
26        THE COURT:
27              He was what, sir?
28        THE WITNESS:
29              Dry heaving.
30   (Court reporter had difficulty understanding
31   witness.)
32   BY MS. AFRICK:
```

219

1    Q     Can you explain, what is a dry

2    heave or what was Mr. Treaudo doing, what was

3    that noise?

4    A     It's a noise that a person would

5    make as if they were going to throw up, but

6    nothing would come up.

7    Q     So we hear on the tape

8    Mr. Treaudo making this noise.  At any time

9    did you ask him if he was well enough to

10   continue?

11   A     Yes.

12   Q     Did you ask him if he needed any

13   medical treatment?

14   A     Yes.  He refused.

15   Q     Did you say he could only get

16   medical treatment if he finished his

17   statement or anything like that?

18   A     No.  He just stated that he was

19   nervous, that was it.

20   Q     Did you have any further

21   involvement in this investigation?

22   A     You mean as it relates to the

23   interview?

24   Q     In regards to the investigation

25   as a whole?

26   A     Yes.

27   Q     And what was that?

28   A     Once both arrests were done, of

29   course, they were transported to Lockup to be

30   booked.  The  investigation was concluded

31   pending some examinations and that was about

32   it.

220

```
1        MS. AFRICK:
2              Thank you, Detective.  At
3        this time I would tender the
4        witness.
5              CROSS EXAMINATION
6   BY MR. BOGGS:
7        Q    Detective, you were the lead
8   investigator in this matter, correct?
9        A    Yes, sir.
10       Q    And before your testimony today
11  you reviewed the police reports in this
12  matter, correct?
13       A    Yes.
14       Q    And did you notice any errors or
15  anything that was left out of those police
16  reports?
17       A    Yes.
18       Q    What were those errors or what
19  was left out?
20       A    I did notice that I had Allen
21  stated instead of Treaudo.
22       Q    In what sections were those
23  errors located?
24       A    In the narrative section.
25       Q    Is there a specific part of the
26  narrative where it says Allen rather than
27  Treaudo?
28       A    I believe it's page 19 and page
29  17.
30       Q    Page 19 and, I'm sorry?
31       A    Page 17.
32       Q    Now, Officer, you indicated that
```

221

1  you did an identification procedure with --
2  let me make sure I have this right, the last
3  known caller?
4       A    The last call witness.
5       Q    The last call witness, I
6  apologize.
7       A    Yes, I did.
8       Q    Did you perform that
9  identification procedure with regard to
10 Mr. Treaudo with scene witness number 1,
11 correct?
12      A    Yes.
13      Q    And, officer, did you show the
14 lineups containing Mr. Treaudo to any other
15 witnesses besides scene witness number 1 and
16 the last call witness?
17      A    Yes.
18      Q    How many other witnesses did you
19 show a lineup that included Mr. Treaudo?
20      A    One.
21      Q    And was that scene witness number
22 2?
23      A    Yes.
24      Q    And scene witness number 2 failed
25 to pick Mr. Treaudo out of the lineup,
26 correct?
27      A    Correct.
28      Q    Now, let's talk about scene
29 witness number 1.  Well -- (Off record
30 discussion with DA.)  Now, Detective, you
31 also showed a photographic lineup to the fav
32 five witness; is that correct?

222

1        A     Yes.

2        Q     I apologize.  So there were three

3    witnesses who made positive identifications

4    of Mr. Treaudo, by your testimony?

5        A     Give me a second.  Correct.

6        Q     And by your testimony today, you

7    only showed the lineup to one other witness;

8    is that correct?

9        A     Yes.

10       Q     Well, let's go back to scene

11   witness number 1.  Scene witness number 1

12   indicated to you that they did not witness

13   the shooting, correct?

14       A     Correct.

15       Q     Scene witness number 1 heard

16   shots only, correct?

17       A     Incorrect.

18       Q     Well, in relation to the shooting

19   itself the shots, they did not see them being

20   fired, correct?

21       A     That's right.

22       Q     And then scene witness number 1

23   looked out toward the direction of the shots,

24   correct?

25       A     Yes.

26       Q     And saw the SUV driving away; is

27   that correct?

28       A     Yes.

29       Q     And that's how scene witness 1

30   gave you the descriptions of the SUV and the

31   people inside it, correct?

32       A     Yes.

223

1    Q    Now, did scene witness 1 indicate
2  that they had ever seen either one of the
3  people that they described inside the
4  vehicle before?
5    A    No.
6    Q    So they weren't able to provide
7  you with a name or any indication of who the
8  people were, correct?
9    A    Correct.
10   Q    And it was scene witness number 1
11 who gave you a partial license plate,
12 correct?
13   A    Yes.
14   Q    And scene witness number 1
15 indicated to you that they only saw the SUV
16 and the people inside of it for a few
17 seconds, correct?
18   A    I can assume a few seconds, but
19 they did not state a few seconds.
20   Q    Did scene witness number 1 call
21 911?
22   MS. AFRICK:
23         I'm going to object as to
24         relevance, your Honor, outside
25         the scope of the motion hearing.
26   THE COURT:
27         I'll sustain that.
28   MR. BOGGS:
29         I'm sorry, sir?
30   THE COURT:
31         Sustained.
32 BY MR. BOGGS:

224

1    Q    Well, how did you find scene
2  witness number 1?
3    A    As I stated earlier, before I
4  arrived on the scene, Det. Chambers was
5  conducting my scene for me until I arrived.
6  That was the information he provided me with.
7    Q    What was all of the information
8  that scene witness 1 told you that they
9  witnessed?
10   A    There was --
11  MS. AFRICK:
12       Your Honor, I'm going to
13       object at this time.  No motion
14       for probable cause lies and I'm
15       not sure how everything this
16       witness told him could be
17       relevant to a motion to suppress
18       ID.
19  THE COURT:
20       And I'll sustain that.  Let's
21       clarify that.
22  BY MR. BOGGS:
23   Q    Detective, scene witness number 1
24  indicated they were on which side of the
25  vehicle as they saw it for a few seconds?
26   A    The driver's side.
27   Q    And the vehicle was going from
28  the left to right or from the right to
29  left?
30   A    The scene would have been right
31  and the vehicle was traveling left.
32   Q    Now, scene witness number 1 had

225

```
 1    -- and I don't want you to reveal -- you
 2    know, we've already had an objection on the
 3    ruling, so I don't want you to violate that
 4    ruling.  However, scene witness number 1 was
 5    inside of a structure, correct?
 6         A    Correct.
 7         Q    And they were looking through a
 8    window, correct?
 9         A    Yes.
10         Q    And did they indicate on what
11    floor they were looking through the window?
12         A    Street level.
13         Q    And there are trees on that
14    street, correct?
15         A    Yes.
16         Q    And there are cars parked along
17    that street, normally, correct?
18         A    I can't say.  There's driveways,
19    so I can't say if they were on the street or
20    not.
21         Q    Well, you were on the scene that
22    day, the day of the shooting, and there were
23    cars parked on the street that day, correct?
24         A    Not in the crime scene.
25         Q    Now, scene witness number 1
26    indicated -- did you ask scene witness number
27    1 how far they were from the vehicle as the
28    vehicle left?
29         A    I did not.
30         Q    Did you take any type of written
31    statement or recorded statement from scene
32    witness number 1?
```

226

1       MS. AFRICK:

2           Your Honor, I'm going to

3           object at this time, it goes to

4           discovery.

5       THE COURT:

6           Overruled.  You can answer

7           that.

8       THE WITNESS:

9           Yes.

10  BY MR. BOGGS:

11      Q    And was that a recorded statement

12  from scene witness number 1?

13      MS. AFRICK:

14          Your Honor, I'm going to

15          renew my objection at this time.

16          Written or recorded statements

17          made by witnesses are not

18          discoverable.  And, again, it

19          goes to discovery and not in any

20          way a motion to suppress ID.

21      THE COURT:

22          We're not going into the

23          substance.  I'll permit that, you

24          may answer that question,

25          officer.

26  BY MR. BOGGS:

27      Q    Was it recorded?

28      A    Yes, sir.

29      Q    Now --

30      MR. BOGGGS:

31          And, your Honor, I apologize,

32          I can't remember which

227

1              identification -- which exhibit

2              goes with scene witness 1

3              regarding Michael Treaudo.

4        MS. AFRICK:

5              I believe that's State's

6              Exhibit 2.

7   BY MR. BOGGS:

8        Q    And, Officer, that would -- we've

9   already had a ruling and the objection was

10  noted in that ruling.  But without violating

11  that ruling, could you look at State's

12  Exhibit 2 and tell me what time and day that

13  that identification was made?

14       MS. AFRICK:

15             Just a moment, I retrieved

16             all of the documentation from the

17             Officer.  Let the record reflect

18             that handing the Officer what

19             I've previously marked as State's

20             Exhibit 2.

21  BY MR. BOGGS:

22       Q    Officer, can you look at the back

23  and just tell me what time and date that

24  scene witness number 1 made that

25  identification?

26       A    June 8th, 10:41 a.m.

27       Q    And you were testifying that

28  Det. Chambers -- you were partners with him

29  at the time of that identification; is that

30  correct?

31       A    Yes.

32       Q    And, I apologize, I'm backing up

228

1  a little bit.  It was Det. Chambers who
2  brought scene witness 1 to your attention at
3  the original scene, correct?
4          A     Yes.
5          Q     So that witness had already
6  spoken to Det. Chambers before you had a
7  chance or opportunity to interview that
8  witness, correct?
9          A     You mean in the form of an
10  official statement?
11          Q     He had spoken to that witness
12  before you spoke to scene witness number 1?
13          A     Correct.
14          Q     Now, scene witness number 2, who
15  failed to perform the procedure or who failed
16  to make an identification, when and where was
17  that witness presented?
18          A     When?
19          Q     Yes, sir.
20          A     The same day.
21          Q     And was that at the same time?
22          A     After.
23          Q     And scene witness number 2
24  indicated they were on which side -- scene
25  witness number 2 also did not witness the
26  shooting; is that correct?
27          A     Correct.
28          Q     And scene number 2 also indicated
29  that they were inside of a structure looking
30  through a window, correct?
31          A     Correct.
32          Q     And did scene witness number 2

229

1    see the same -- have the same opportunity to

2    observe as scene witness number 1?

3          A     They provided me with a number of

4    shots and a vehicle description.

5          Q     Now, how far away was scene

6    witness number 2 from the car as the car

7    drove away?

8          A     From the street to the sidewalk,

9    a little bit past the sidewalk.  For visual

10   purposes, maybe from where I'm seated to the

11   front door of the court.

12         Q     Let's talk about the last call

13   witness.  You performed an identification

14   with the last call witness; is that correct?

15         A     Yes.

16         Q     And the last call witness picked

17   out Mr. Treaudo, correct?

18         A     Yes.

19         Q     And the last call witness

20   indicated that they knew Mr. Treaudo,

21   correct?

22         A     Yes.

23         Q     And how long had the last call

24   witness said that they had seen

25   Mr. Treaudo?

26         A     (No response.)

27         Q     How well did they know him?

28         A     Well enough to provide a first

29   and last name.

30         Q     When was the last time had the

31   last call witness seen Mr. Treaudo?

32         MS. AFRICK:

230

52

1               Your Honor, I'm going to

2            object as to relevance.

3     THE COURT:

4              I'll sustain that.

5  BY MR. BOGGS:

6     Q   Now, the last call witness was

7  the person who received a hearsay statement

8  from the decedent, correct?

9     A   Incorrect.

10    Q   Who received the hearsay

11  statement from the decedent?

12    A   It wasn't hearsay.

13    Q   Well, the statement from the

14  decedent -- the last call witness received a

15  statement from the decedent about his

16  location, correct?

17    A   Yes.

18    Q   And other than that statement,

19  the last call witness had no knowledge of the

20  shooting, had no information regarding the

21  shooting, correct?

22    A   Correct.

23    Q   If I can go back.  You performed

24  an identification with the fav five, the

25  favorite five individual, correct?

26    A   Yes.

27    Q   And she indicated that Rat Rat,

28  Mr. Brown, was picked up from her house,

29  correct?

30    A   Yes.

31    Q   And then she indicated that it

32  was Mr. Treaudo and one other individual

231

1   picked Rat Rat up, correct?

2       A    Incorrect.  She stated that she

3   only saw Michael Treaudo.  It was other

4   individuals that indicated that there was a

5   second male.

6       Q    And you took a taped recorded

7   statement from the favorite five individual

8   as well?

9       MS. AFRICK:

10              Your Honor, I'm going to

11          object, again, under Criminal

12          Code Procedure Article 723

13          entitled State Reports and Other

14          Matters not Subject to

15          Disclosure.  Statements made by

16          witnesses or suspected witnesses

17          are not subject to disclosure,

18          so, therefore, should not come in

19          as part of this motion hearing.

20      MR. BOGGS:

21              Judge, we're not going to

22          state the substance of it, we're

23          going to the existence --

24      THE COURT:

25              I will so rule.  As to

26          whether the statement was given,

27          without going into the substance,

28          you can answer that.

29      THE WITNESS:

30              Was it audio recorded?

31   BY MR. BOGGS:

32       Q    Yes, sir.

1      A      Yes.

2      Q      Now, how well did she say that

3   she knew Mr. Treaudo?

4      A      That he lived in the

5   neighborhood.  She -- he or she did not go

6   into the length of time.

7      Q      And she (sic) was unable to give

8   a proper name; is that correct, she just knew

9   him as Son?

10      A      I believe I was provided with a

11   last name, also.

12      Q      Well, how long did she say she

13   observed Mr. Treaudo when Mr. Brown was

14   picked up that day?

15      A      They waited outside for about 15

16   to 20 minutes.

17      Q      Now, let's talk about the search

18   warrant regarding the SUV, the  vehicle.  You

19   personally supervised the searching of the

20   SUV, correct?

21      A      Yes.

22      Q      And you directed that photographs

23   be taken of the interior of the SUV, correct?

24      A      Yes.

25      Q      And there was no blood, large

26   amounts of blood or blood stains, inside the

27   SUV; correct?

28      A      There was a red stain on the roof

29   of the roof of the vehicle, but there was not

30   a large amount of apparent blood in the

31   vehicle.

32      Q      And that red stain was on the

233

1    interior roof of the vehicle?

2         A    Yes.

3         Q    And that's the place where the

4    sample was collected for ballistics analysis,

5    correct?

6         A    Serology.

7         Q    Serology.  I apologize.

8         A    Yes.

9         Q    And that red spot we're saying

10   was also photographed, correct?

11        A    Yes.

12        Q    Now, in your arrest warrant for

13   Mr. Treaudo, you made a sworn statement that

14   according to witnesses the decedent was shot

15   inside of the vehicle and his lifeless body

16   was thrown outside of the vehicle, correct?

17        A    Correct.

18        Q    But subsequent investigation

19   indicated that that was not true, correct?

20        A    Correct.

21        Q    Now, you performed and obtained

22   -- had formed a search of the address at 437

23   whitney, correct?

24        A    Yes.

25        Q    And that's the residence of owner

26   of the SUV, correct?

27        MS. AFRICK:

28             Objection, your Honor.

29        THE COURT:

30             I'll sustain that.

31   BY MR. BOGGS:

32        Q    And the only item that you took

234

1   there was the white cotton T-shirt,

2   correct?

3       A    From Whitney?

4       Q    From Whitney, yes.

5       A    Yes.

6       Q    The address 3420 Adrian Street,

7   that search warrant was in relation to

8   Michael Allen, correct?

9       A    Yes.

10      Q    Now, you never obtained a search

11  warrant or performed a search at the address

12  of 3630 Frenchmen Street, correct?

13      A    A search was conducted.  It was a

14  voluntary search, but a search warrant was

15  not obtained, even though we attempted to

16  obtained one.

17      Q    And the search at 36 -- so that

18  means there was a consent to search given at

19  3630 Frenchmen Street?

20      A    Yes.

21      Q    And there were no items collected

22  during the search at 3630 Frenchmen Street,

23  correct?

24      A    Yes, there were.

25      Q    Okay, I apologize.  What were the

26  items that were collected at 3630 Frenchmen

27  Street?

28      A    A .45 caliber semi-automatic

29  weapon.  It did not have a magazine.  There

30  was one live round in the chamber; a bottle

31  of gun oil and a cell phone.  It was

32  underneath a sofa cushion, altogether under a

235

1   sofa cushion.

2       Q    And the bottle was a bottle of

3   what?

4       A    Gun cleaning oil.

5       MS. AFRICK:

6               And just so Defense Counsel

7               is aware, Det. Nick Gernon is

8               available outside in regards to

9               that.

10  BY MR. BOGGS:

11      Q    Were those items collected by you

12  or were they collected by Sgt. Gernon?

13      A    Another detective.

14      Q    Now in regards to the statement

15  of Mr. Treaudo.  (Obtaining exhibit from the

16  State.)  Now, you spoke to Mr. Treaudo before

17  -- well, you began to interview Mr. Treaudo

18  before turning on the tape recorder, correct?

19      A    Yes, sir.

20      Q    And you asked him for everything

21  that had happened before you turned on the

22  tape recorder, correct?

23      A    Yes.

24      Q    And you went over the Rights of

25  Arrestee Form before turning on the tape

26  recorder, correct?

27      A    No.  What I did first, once he

28  was transported to the office, the Homicide

29  Office, I advised him of his rights from the

30  Rights of Arrestee Form first and he waived

31  his rights, then we began to speak.  It was

32  my attempt to gather the facts just to see

236

```
1   what he wanted to say.  Then I started the
2   tape, again, as an official document.  I
3   advised him of his rights again and we went
4   on the tape from there.
5        Q    Who else was present during this
6   time?
7        A    No one.
8        Q    And you did this at Police
9   Headquarters, correct?
10       A    Yes.
11       Q    And you did this in the interview
12  room, correct?
13       A    Yes.
14       Q    And, Officer, you're trained in
15  techniques of interrogation as a homicide
16  detective, correct?
17       A    We gain our knowledge through
18  experience.
19       Q    Well, Detective, you never
20  attended training on how to obtain a
21  statement from a suspect?
22       A    No, sir.
23       Q    Now, Detective, you said that you
24  met Mr. Treaudo, you informed him of his
25  rights, you discussed the interview with him
26  and once you went through everything, then
27  after that, that's when you turned on the
28  tape recorder, advised him of his rights
29  again and went through his statement then,
30  correct?
31       A    Yes.
32       Q    Did you do anything in-between --
```

237

1    let me back up, that was one continuous
2    interview, correct?
3           A    Pretty much.
4           Q    Well, Detective, you initially
5    met with him at 7:01 a.m., correct, that's
6    when you initially advised him of his rights
7    and had him sign and check the Rights of
8    Arrestee Form?
9           A    Yes.
10          Q    And then you didn't turn on the
11   tape recorder until 9:03 a.m., correct?
12          A    That should be about right.
13          Q    Would it refresh your
14   recollection to see a copy -- it would
15   refresh your recollection, Officer, to see a
16   copy of the transcription?
17          A    It would give me the exact time,
18   yes.  (Document provided to the witness.)
19   Yeah, at 9:03, that's right.
20          Q    And then the tape recorded
21   statement concludes at 9:23 a.m., correct?
22          A    Yes.
23          Q    So the tape recorded portion of
24   the statement is only 20 minutes long,
25   correct?
26          A    Yes.
27          Q    But you spoke to Mr. Treaudo for
28   over two hours about his -- about what
29   happened before you turned on the tape
30   recorder, correct?
31          A    Yes.
32          Q    Now, you already indicated that

238

1  during the tape recording version of

2  Mr. Treaudo's statement that he was dry

3  heaving, correct?

4       A    Yes.

5       Q    Which means that his body was --

6  he was vomiting, but he had nothing in his

7  stomach to vomit, correct?

8       A    Yes.

9       Q    And all of that is audible on the

10  tape recording, correct?

11       A    Yes, sir.

12       Q    You relied simply on asking him

13  if he was okay and able to continue and that

14  was the only thing you relied on to make a

15  judgment that he was capable of making a

16  waiver, correct?

17       A    No, sir.

18       Q    Well, was he examined by any

19  medical doctors?

20       A    He was not.

21       Q    Did you ask him -- you didn't ask

22  anyone to come in and look at him and give a

23  second opinion about it, correct?

24       A    He refused.

25       Q    He what?

26       A    He refused.

27       Q    Officer, did you offer him

28  anything to eat?

29       A    Yes.

30       Q    But not in the tape recorded

31  portion of the statement, correct?

32       MS. AFRICK:

239

1                 Your Honor, I'm going to

2            object.  I think the tape

3            recorded portion speaks for

4            itself.

5    THE COURT:

6            It will, but he also knows.

7            Does that appear on the tape?

8    THE COURT:

9            He was not eating during the

10           taped portion.

11 BY MR. BOGGS:

12    Q    During the tape recorded portion,

13 you didn't offer him a drink of water,

14 correct?

15    A    A cup was on the table during the

16 interview, a cup of water.

17    MR. BOGGS:

18            Judge, if I could just have

19            one moment.  (Pause)  Thank you

20            for your patience.  Judge, thank

21            you for your patience.  I have no

22            further questions.

23    THE COURT:

24           . Mr. Malveau?

25           CROSS EXAMINATION

26 BY MR. MALVEAU:

27    Q    Just a few questions, Detective.

28 If I'm correct, the only person that made an

29 identification or named Michael Allen as a

30 perpetrator was the last call witness,

31 correct?

32    A    Correct.

240

1      Q    Who else identified Mr. Allen as

2  a perpetrator in this crime, other than Mr.

3  Treaudo, I guess you would say?  Mr. Treaudo

4  is the other person?

5      A    Yes.  And also the vehicle's

6  owner.

7      Q    That would be the favorite five

8  witness; is that the vehicle owner or not?

9      A    That person, yes, sir.  You have

10  the vehicle owner, the last call witness and

11  Treaudo.

12      Q    Well, let me ask you this,

13  officer, in relation to the owner of the

14  vehicle, the owner of the vehicle only told

15  you that she lent the car to Mr. Treaudo and

16  Mr. Allen, correct?

17      A    Yes.

18      Q    That witness never gave you any

19  information as to who was in the vehicle at

20  the time of the incident, correct?

21      A    Correct.

22      Q    And the favorite five witness,

23  this is the, I guess you would say, the last

24  person who saw the deceased person alive;

25  would that be correct?

26      A    The favorite five is one person

27  and the last call person is another person.

28      Q    Okay, two separate people.

29  Moving on to the favorite five person, that

30  person did not pick Micheal Allen out of a

31  lineup, correct?

32      A    Correct.

241

1       Q    And what I was getting at with

2   that question is the favorite five witness,

3   is the -- other than the alleged

4   perpetrators, the last person who saw the

5   deceased alive, correct?

6       A    Saw the person alive.

7       Q    Correct, saw, that's what I

8   meant.  And as far as the actual people who

9   were at the scene of the incident, there were

10  two scene witnesses, correct?

11      A    Yes.

12      Q    The first scene witness picked

13  Mr. Treaudo, but not Mr. Allen, correct?

14      A    Correct.

15      Q    And the second witness did not

16  pick either Mr. Allen or Mr. Treaudo,

17  correct?

18      A    Correct.

19      Q    Just you a few questions and

20  these are related to the last call witness.

21  The last call witness said that the deceased

22  called her and said that he was with Son and

23  Mike, correct?

24      A    Yes.

25      Q    And it's alleged that Mike is

26  Michael Allen, correct?

27      A    Yes.

28      Q    Did you receive any information

29  from the last call witness as to how she

30  knows that the Mike the deceased referred to,

31  was, in fact, Michael Allen, as opposed to

32  another person named Michael out there?

242

1      A    Because those were nicknames that

2 they commonly go by.  That person had

3 knowledge that these two gentlemen were

4 always together.

5      Q    But my question is to you, is

6 there anything you received from that

7 particular witness, the last call witness,

8 that indicated that Michael Allen was, in

9 fact, the Michael the deceased was referring

10 to, as opposed to the hundreds and hundreds

11 of people who are called Mike out there?

12      A    Nothing in addition to what I've

13 stated already.

14      Q    So the only thing she was going

15 by is the fact that Michael Treaudo and,

16 supposedly, Michael Allen are friends?

17      A    Son and Mike, yes.

18      Q    And this last call witness has no

19 firsthand knowledge of who was in the

20 vehicle, correct?  She didn't see anything --

21 he or she didn't see anything?

22      A    The only knowledge that that

23 person knows is what was related to that

24 person, but visually seeing, no, sir.

25      Q    When you say the last call

26 witness, the person is not really a witness,

27 correct, they didn't actually see anything in

28 regards to this crime, correct?

29      A    That person did not observe a

30 shooting.

31      Q    Just a couple of questions on the

32 warrant for Adrian Street.  That was the

243

1    alleged witness of Michael Allen, correct?

2         A    Yes.

3         Q    And you got the search warrant

4    for that residence, correct?

5         A    Yes.

6         Q    And I see on your facts

7    supporting your search warrant, you have "He

8    was positively identified as one of the

9    individuals responsible for the killing of

10   the victim." Is that statement based upon

11   what you got from the last call witness?

12        A    Yes.

13        Q    So, in fact, you put in your

14   warrant that he was properly identified as

15   one of the perpetrators.  At that point he

16   really wasn't identified as one of the

17   perpetrators, he was only -- the only

18   information you got was a name from someone

19   who wasn't even out there, correct?

20        A    Based upon my investigation at

21   that time, one could reasonably conclude that

22   he was in the vehicle at the time of the

23   homicide.

24        Q    But you don't have any

25   information, other than what that last call

26   witness told you, you don't have any other

27   information that connects Michael Allen to

28   being in that vehicle at the time of the

29   murder, correct?

30        MS. AFRICK:

31             Your Honor, I'm going to

32             object at this time, what motion

244

1       does this go to other than

2       probable cause, which does not

3       lie?

4    THE COURT:

5       I'll sustain that.

6    MR. MALVEAU:

7       It goes to the warrant,

8       Judge.  The facts in the warrant

9       indicate the fact that my client

10      wasn't identified as a person who

11      committed the crime.

12   THE COURT:

13      I'll reverse.  You can answer

14      the question.

15   THE WITNESS:

16      Based on that information,

17      whether or not he was the actual

18      shooter, as I stated, he was

19      responsible meaning he had some

20      involvement directly related to

21      the death of the victim.

22 BY MR. MALVEAU:

23    Q   So, in other words, the only

24 evidence that you have, other than what

25 Mr. Treaudo said, the co-defendant, other

26 than what he said, the only evidence that

27 connected Michael Allen to anything resulting

28 in the homicide is a statement given to

29 someone from the deceased, correct?  The last

30 call witness, correct, that's the only

31 information you have connecting my client to

32 his murder?

245

1      MS. AFRICK:

2             Your Honor, I'm going to

3          object to this as misleading.

4      THE COURT:

5             Sustained.

6      MR. MALVEAU:

7             It's not misleading, Judge,

8          either it's true or it's not, yes

9          or no.

10   BY MR. MALVEAU:

11      Q      Is the only evidence you have

12   connecting Michael Allen to this murder the

13   information you received from the last call

14   witness, other than Mr. Treaudo?

15      THE COURT:

16             Overruled.  You may answer

17          the question.

18      THE WITNESS:

19             How you say that again, sir?

20   BY MR. MALVEAU:

21      Q      Other than the information the

22   given by the -- is there any other evidence

23   connecting Michael Allen to this murder

24   besides the statement from the last call

25   witness?

26      A      And the evidence collected during

27   the search warrants.

28      MR. MALVEAU:

29             I'll just leave it alone,

30          Judge.  No further questions.

31      THE COURT:

32             Redirect?

246

1      MS. AFRICK:

2              Yes, your Honor.

3              REDIRECT EXAMINATION

4   BY MS. AFRICK:

5      Q     Now, Detective, I want to take

6   you back to the statement of Michael Treaudo,

7   you stated you first advised him of his

8   Miranda rights from the Rights of Arrestee

9   Form at 7 a.m. or approximately 7 a.m.?

10     A     Yes.

11     Q     At that time, those were the

12  rights that you read into the record today

13  from the Rights of Arrestee Form?

14     A     Yes.

15     Q     At that time, did Mr. Treaudo

16  state that he understood those rights?

17     A     Yes.

18     Q     When you initially began your

19  interview, you were not taping for the

20  interview; is that correct?

21     A     Correct.

22     Q     Now, during this portion of the

23  interview that was not tape recorded, did you

24  force him to make a statement?

25     A     I did not.

26     Q     Did you promise him anything for

27  making a statement?

28     A     No, ma'am.

29     Q     Did you threaten him into making

30  a statement?

31     A     No, ma'am.

32     Q     Did you tell him he had make a

247

1  statement?

2       A    No.

3       Q    During this pre-taped portion,

4  did you offer Mr. Treaudo medical treatment?

5       A    At that time he was pretty

6  normal.  The dry heaving and things of that

7  nature didn't really start until the taped

8  portion.

9       Q    Now, when he began to act as if

10 he was ill and dry heaving, did you offer him

11 medical treatment at that time?

12      A    Yes, I did.

13      Q    During the course of the

14 pre-interview, did you offer him something to

15 eat?

16      A    Yes.

17      Q    Did you offer him something to

18 drink?

19      A    Yes.

20      Q    Now, during the course of the

21 taped statement, did you offer him a coke?

22      A    He had something to drink in a

23 cup during the statement.

24      Q    At any time, did he say anything

25 or do anything that indicated that he could

26 not go forward with the statement?

27      A    No.

28      Q    Did you tell him that he could

29 stop the statement at any time if he wasn't

30 feeling well?

31      A    I did not make that statement.

32 But at any time that I observed, in my

```
 1    opinion, I'm not a doctor, but just observed
 2    him cough or whatever he was doing, I asked
 3    him, are you okay, are you sure you want to
 4    go -- are you sure would like to continue.
 5    He said, "Yes.  My nerves are bad, I'm
 6    nervous."  And I believe I gave him a
 7    cigarette.  I'm not sure.
 8         Q     Now I just want to ask one
 9    further question.  Earlier you stated that
10    you had narrowed down from one of the
11    witnesses that the time of the actual
12    homicide was around 12:30.  Was that daytime
13    or nighttime, 12:30 noon or 12:30 midnight?
14         A     12:30 noon.
15    MS. AFRICK:
16              I have no further questions
17              on redirect.
18    THE COURT:
19              You may step down, Detective.
20    MS. AFRICK:
21              I have two more witnesses,
22              your Honor, but I'm requesting a
23              two-minute recess.
24    MR. BOGGS:
25              Judge, there was a
26              sequestration order in effect.
27    THE COURT:
28              Yes.  The sequestration order
29              remains in effect.  Don't discuss
30              your testimony, Detective,
31              please.  Any other witnesses in
32              this case, step outside until
```

249

```
 1              your name is called.
 2                   (BRIEF RECESS)
 3         THE COURT:
 4                   Let's proceed with motions.
 5         MS. AFRICK:
 6                   Yes, your Honor.
 7         THE COURT:
 8                   You may call your next
 9              witness.
10         MS. AFRICK:
11                   Your Honor, at this time the
12              State calls Det. Robert Long.
13                   DET. ROBERT LONG
14    AFTER HAVING BEEN FIRST DULY SWORN TESTIFIED
15    UNDER OATH AS FOLLOWS:
16                   DIRECT EXAMINATION
17    BY MS. AFRICK:
18         Q    Good afternoon, Detective.  Could
19    you please state your name, occupation and
20    assignment for the record?
21         A    Yes.  Robert Long assigned to the
22    New Orleans Police Department, Homicide
23    Section.
24         Q    And, Det. Long, how long have you
25    been with the New Orleans Police Department?
26         A    About five years.
27         Q    How long have you been with
28    Homicide?
29         A    Two years.
30         Q    Now, Detective, did you have the
31    occasion to participate in the investigation
32    of a homicide that took place on June 7th of
```

250

1    2009?

2          A     Yes.

3          Q     During the course of that

4    investigation, did you have an opportunity to

5    speak with someone for motion hearing

6    purposes we'd call the owner of the vehicle?

7          A     Yes.

8          Q     Now, this person, the owner of

9    the vehicle, where did you speak with this

10   person?

11         A     In the Homicide Office in the

12   interview room.

13         Q     And who else was present?

14         A     Det. Mike McCleary.

15         Q     Now, during the course of

16   speaking with the owner of the vehicle,  what

17   did you learn from the owner of the vehicle?

18         A     We learned that the vehicle was

19   loaned to Micheal Treaudo for unknown reasons

20   or reasons unknown to the owner of the

21   vehicle.  At the time it was loaned, I

22   believe it was told to the owner that he was

23   going to pick up Big Mike.

24         THE COURT:

25               Pick up what?

26         THE WITNESS:

27               Pick up Big Mike,

28         Michael Allen.

29   BY MS. AFRICK:

30         Q     Did you learn from speaking with

31   the owner of the vehicle who Big Mike was?

32         A     Yes.

251

1     Q    And who was that?

2     A    Michael Allen.

3     Q    Was the owner of the vehicle able

4 to identify Michael Allen by name?

5     A    Yes.

6     Q    Did you learn that the owner of

7 the vehicle knew Michael Treaudo, who she

8 said that she loaned the car to?

9     A    Yes.

10     Q    Did you learn that the owner of

11 the vehicle knew Michael Allen?

12     A    Yes.

13     Q    Did you have the occasion to show

14 the owner of the vehicle a photographic

15 lineup?

16     A    Yes.

17     Q    How many photographic lineups did

18 you show this person?

19     A    Two, one of each, Michael Treaudo

20 and Michael Allen.

21     Q    Do you recall what you said to

22 this person prior to showing this person the

23 photographic lineups?

24     A    Yes.  I believe, if I remember

25 correctly, the photographic lineups were

26 presented one at a time and face down.  And I

27 asked the person to turn the photographic

28 lineups over and see if she would recognize

29 anyone depicted in the six photographs.

30     Q    Did the owner of the vehicle make

31 any identifications?

32     A    Yes.  If I remember, correctly, I

252

1  think that the Michael Treaudo lineup was the
2  first shown.  And the owner of the vehicle
3  immediately pointed to the photograph of
4  Michael Treaudo and said, "That's
5  Mike Treaudo."
6      MS. AFRICK:
7              Let the record reflect that
8          I'm showing Defense Counsel what
9          I've previously marked as State's
10         Exhibit 13.
11     MR. BOGGS:
12             Judge, note our objection on
13         the previous --
14     THE COURT:
15             Continuing objection on
16         behalf of the Defense to the
17         Court's ruling.
18     MR. BOGGS:
19             I feel like we should
20         re-visit it.  The State is
21         alleging facts that the car was
22         borrowed by the defendant, not
23         that it was stolen.  So I don't
24         understand how the identity could
25         be at question since all the
26         facts that they are alleging --
27     MS. AFRICK:
28             In an abundance of caution,
29         it protects this person's safety.
30     THE COURT:
31             The Court's ruling stands.
32         I'll note a continuing objection

253

1          on behalf of the Defense.
2      MS. AFRICK:
3              May I approach the witness,
4          your Honor?
5      THE COURT:
6              Yes.
7  BY MS. AFRICK:
8      Q    Detective, I'm handing you what
9  I've previously marked as State's Exhibit 13.
10 Can you identify what I've just handed you?
11     A    Yes.  This is a six-person color
12 photographic lineup.
13     Q    And does that photographic
14 lineup, marked as State's Exhibit 13, contain
15 a photograph of Michael Treaudo?
16     A    Yes.
17     Q    Did the owner of the vehicle
18 identify Michael Treaudo?
19     A    Yes.
20     Q    Did you promise the owner of the
21 vehicle anything for making an
22 identification?
23     A    No.
24     Q    Did you force or threaten this
25 person into making an identification?
26     A    No.
27     Q    Did you suggest to this person in
28 any way who to identify?
29     A    No.
30     Q    Did you also show this person a
31 photographic lineup containing a photograph
32 of Michael Allen?

254

```
1           A     Yes.
2      MS. AFRICK:
3                 Let the record reflect that
4                 I'm showing Defense Counsel what
5                 I've previously marked as State's
6                 14.  May I approach the witness,
7                 your Honor.
8      THE COURT:
9                 Yes.
10  BY MS. AFRICK:
11          Q     Detective, I'm handing you what
12  I've previously marked as State's Exhibit 14.
13  Can you identify what I've just handed you?
14          A     Yes.  It's a six-person
15  photographic lineup.
16          Q     And does that photographic lineup
17  contain a photograph of Michael Allen?
18          A     Yes.
19          Q     And did the owner of the vehicle
20  make an identification from that photographic
21  lineup?
22          A     Yes.
23          Q     Who did the owner of the vehicle
24  identify?
25          A     Michael Allen, photograph number
26  5.
27          Q     And, again, did you promise this
28  person anything for making an identification?
29          A     No.
30          Q     Did you force or coerce this
31  person into making an identification?
32          A     No.
```

255

1     Q   Did you suggest to this person in

2  any way who to identify?

3     A   No, ma'am.

4     Q   In regards to this investigation,

5  did you show anyone else the photographic

6  lineup?

7     A   No, ma'am.

8  MS. AFRICK:

9        I have no further questions.

10       I tender the witness at this

11       time.

12           CROSS EXAMINATION

13  BY MR. BOGGS:

14     Q   Detective, who else was present

15  during the interview with the owner of the

16  vehicle?

17     A   Just myself, Det. Michael

18  McCleary and, at some point during the

19  interview, Det. Kevin Burns.

20     Q   And that interview was taped,

21  correct?

22  MS. AFRICK:

23       Again, objection, your Honor,

24       not discoverable under Article

25       723.

26  THE COURT:

27       I'll sustain that.

28  MR. BOGGS:

29       We're not asking for the

30       substance, your Honor.

31  THE COURT:

32       You're asking what the mode

256

1              of the interview was, whether it

2              was taped or not?

3       MR. BOGGS:

4              Yes.

5       THE COURT:

6              Okay.  Once again, without

7              giving the substance.

8       THE WITNESS:

9              Yes, it was taped.

10  BY MR. BOGGS:

11     Q    Now, what was the basis -- how

12 did the owner of the vehicle say that she

13 knew Mr. Treaudo?

14     A    I'm sorry, can you repeat the

15 question?

16     Q    How did the owner of the vehicle

17 say that she knew Mr. Treaudo?

18       MS. AFRICK:

19              Your Honor, I'm going to

20              object at this time.  This goes

21              specifically to the identity of

22              this person.

23       THE COURT:

24              Repeat that, what's the

25              objection?

26       MS. AFRICK:

27              How does this person know

28              Michael Treaudo?

29       THE COURT:

30              I'll overrule that.  You may

31              answer the question.

32       THE WITNESS:

257

1              I don't know.
2    BY MR. BOGGS:
3         Q    So you didn't ask her the basis
4    of the identification; is that correct?
5         A    I'm not sure I understand your
6    question.
7         Q    Well, the owner of the vehicle
8    said she loaned the car to Mr. Treaudo,
9    correct?
10        A    That's correct.
11        Q    So, presumably she saw
12   Mr. Treaudo when she -- they had some
13   previous relationship prior to her loaning
14   the car to him, right?
15        A    He was named by his full first
16   and last name, so presumably, yes.
17        Q    So you didn't inquire what their
18   relationship was when she said she loaned the
19   car to Michael Treaudo?
20        A    They were acquaintances.  The
21   extent of it, I don't know.
22        Q    When did she say the last time
23   she saw Mr. Treaudo was?
24        A    I believe it was the morning that
25   the car was loaned to him, the morning of the
26   offense.
27        Q    Did she say she gave the car
28   directly to Mr. Treaudo and to Mr. Allen or
29   did she leave the keys for him or did he have
30   an extra set of keys?
31        A    That was not specified.
32        Q    So you don't know whether she saw

258

```
 1   Mr. Treaudo drive off in the car; is that
 2   correct?
 3         MS. AFRICK:
 4               Your Honor, I'm going to
 5               object as to relevance.  How
 6               does this go to a motion to
 7               suppress ID?
 8         THE COURT:
 9               The question was whether the
10               witness had seen the defendant
11               drive off in the car.  What's the
12               objection?
13         MS. AFRICK:
14               How does that go to the
15               motion to suppress
16               identification?
17         THE COURT:
18               I'll overrule it.  You can
19               answer the question.
20         THE WITNESS:
21               That was not specified to us.
22   BY MR. BOGGS:
23         Q    How did you verify -- you're
24   calling her the owner of the vehicle, whether
25   that's actually a fact in question, how did
26   you verify that she was the owner of the
27   vehicle?
28         A    I did not, personally.
29         Q    So, you do not know, sir, that
30   who you've been the calling the owner of the
31   vehicle is actually the owner of the vehicle,
32   correct?
```

259

```
1          A     My involvement in this case was
2    the interview with this person who we are
3    referring to.  The --
4          Q     Sir, I'm asking you a very direct
5    question.
6          A     And I'm answering you.
7    THE COURT:
8                Hold on.  Allow the witness
9                -- answer the question and then
10               you can explain it, Detective.
11   THE WITNESS:
12               Okay.  I am not the -- repeat
13               the question first.
14   BY MR. BOGGS:
15         Q     Sir, you do not know for a fact
16   that the person you've been calling the owner
17   of the vehicle is actually the owner of the
18   vehicle, correct?
19         MS. AFRICK:
20               Your Honor, for motion
21               hearing purposes, we're
22               calling this person the owner
23               of the vehicle.  Whether or not
24               she has papers on this vehicle is
25               of no relevance to the motion to
26               suppress identification.
27         MR. BOGGS:
28               Judge, the question is
29               assuming a fact not in evidence
30               because it's claiming it's her
31               vehicle.
32         MS. AFRICK:
```

260

```
 1                    It was a name I picked, we
 2               can call her the car owner.
 3          THE COURT:
 4                    The question at issue is
 5               whether --
 6          MR. BOGGS:
 7                    He actually knows she's the
 8               owner of the vehicle.
 9          MS. AFRICK:
10                    And whether or not she
11               actually owns it --
12          THE COURT:
13                    I'll grant that.  You may
14               answer that question, if you
15               know.
16          THE WITNESS:
17                    No, I do not.
18     BY MR. BOGGS:
19          Q    Did you construct the
20     photographic lineups?
21          A    No, I did not.
22          Q    And what position is Mr. Treaudo
23     in that photographic lineup?
24          MS. AFRICK:
25                    I believe I retrieved the
26               photographic lineup.  Detective,
27               again, I'm handing you what I've
28               marked as State's Exhibit 13.
29          THE WITNESS:
30                    Position number 2.
31     BY MR. BOGGS:
32          Q    Obeying the Court's previous
```

261

1  ruling, tell me what date and time that
2  identification was made.
3       A     It was made on June 7th, 2009 at
4  5:46 p.m.
5       Q     And I apologize if you testified
6  on direct, where did you perform that
7  identification procedure?
8       A     Within the Homicide Office in an
9  interview room.
10      MR. BOGGS:
11            Thank you for your
12      patience.  Thank you, Judge.
13            CROSS EXAMINATION
14  BY MR. MALVEAU:
15       Q     Just a few questions, Detective.
16  I believe you stated on direct that the owner
17  of the car, or whatever you want to call her,
18  said that she loaned the car to Mr. Treaudo,
19  correct?
20       A     That's correct.
21       Q     And she stated that Mr. Treaudo
22  was going to pick up Big Mike, correct?
23       A     That's correct.
24       Q     And presumably you showed her the
25  lineup and you said that she picked out
26  Michael Allen, correct?
27       A     That's correct.
28       Q     And did she identify him as Big
29  Mike, that that's Big Mike or what did she
30  say when she picked out Michael Allen?
31       A     At some point during the
32  interview, the witness named Big Mike as

262

1   Michael Allen.  When the actual

2   identification was made whether she referred

3   to him as Big Mike, I'm not sure.  But the

4   identification was made -- the photographic

5   lineup was presented to this person for the

6   purpose of confirming who Big Mike was.

7        Q    So what I'm getting from what she

8   told you is that she personally never saw Big

9   Mike inside of the vehicle, correct?

10       A    To my recollection, no.  But to

11  my knowledge, no, sir.

12       MR. MALVEAU:

13            No further questions.

14       THE COURT:

15            Redirect?

16       MS. AFRICK:

17            Very briefly.

18                 REDIRECT EXAMINATION

19  BY MS. AFRICK:

20       Q    Detective, did you ask this

21  person if they owned the vehicle?

22       A    I don't recall.

23       Q    Did this person state that they

24  loaned the vehicle with the license plate

25  ending in 709 to Michael Treaudo?

26       A    Yes.  In fact, the person we

27  interviewed knew the entire license plate

28  number and advised the detectives there.  I

29  think it was RPM709 is what she told us.

30       Q    And the vehicle marked as RPM709,

31  was that a blue green Chevy Tahoe?

32       A    Yes, it was the vehicle in

263

1  question.

2       MS. AFRICK:

3            I have no further questions.

4       THE COURT:

5            You may step down, Detective.

6            Thank you.  I think you have one

7            additional witness.  You may call

8            your next witness.

9       MS. AFRICK:

10            Your Honor, at this time the

11            State would call Det.

12            Nick Gernon.

13            SGT. NICHOLAS GERNON

14  AFTER HAVING BEEN FIRST DULY SWORN TESTIFIED

15  UNDER OATH AS FOLLOWS:

16            DIRECT EXAMINATION

17  BY MS. AFRICK:

18       Q    Good afternoon, Detective.  Could

19  you please state your name, occupation and

20  assignment for the record?

21       A    Yes, ma'am.  My name is

22  Nicholas Gernon.  I'm currently assigned as a

23  Sergeant to the New Orleans Police

24  Department's Eighth District, Second Watch.

25       Q    Were you so assigned on June 7th,

26  of 2009?

27       A    No, ma'am.  At that time I was

28  assigned to the Bureau of Investigations,

29  Homicide Division.

30       Q    Now, Sgt. Gernon, how long have

31  you been with the New Orleans Police

32  Department?

264

1        A     Eight years.

2        Q     I want to take you back to June

3    7th of 2009.  Did you have the occasion to

4    become involved in the investigation of a

5    homicide that occurred on that date?

6        A     I did, several days later.

7        Q     Now, did you have the occasion to

8    go to 3630 Frenchmen Street?

9        A     Yes, ma'am.

10       Q     Why did you go to 3630 Frenchmen

11   Street?

12       A     I had learned that the Tactical

13   Unit -- I'm sorry, we had a location of a

14   subject who was wanted for a homicide,

15   Michael Allen.  They called him Little (sic)

16   Mike, who was wanted for a homicide.  And,

17   Kevin Burns, the led Detective, asked me to

18   go to that location and document the

19   activities there.

20       Q     What happened when you relocated

21   to Frenchmen Street?

22       A     I observed the Tactical Unit make

23   entry into the residence and then we were

24   later, like, five or ten minutes later,

25   informed that the one subject had been

26   located within the residence in the living

27   room area.

28       Q     Did you learn if the arrest

29   warrant for Michael Treaudo was executed?

30       A     Yes, ma'am.  He was taken into

31   custody for that warrant.

32       Q     Did anything else occur at 3630

265

1   Frenchmen Street?

2       A    Yes, ma'am.  My job was basically

3   to document that house as Det. Burns was

4   going to take custody of the subject and talk

5   to him in our offices.   So, I go in, I spoke

6   to the other persons who were present within

7   the house, specifically an Angela Woolridge.

8   She was the owner of the residence.  We

9   informed her that we had located him, he was

10  wanted for murder and that we were waiting

11  for some other detectives to contact the

12  magistrate commissioner and obtain a search

13  warrant for her residence.

14      Q    And did you obtain a search

15  warrant for her residence?

16      A    No, ma'am.  After several hours

17  of unsuccessful attempts to contact a

18  magistrate commissioner, when Ms. Woolridge

19  was asking us what was going on and I was

20  explaining to her we were trying to find a

21  judge.  And she asked me if she could just

22  give permission to conduct the search of her

23  residence.

24      Q    And what happened after that?

25      A    I told her of course she could.

26  I contacted Det. Harmon, who was already on

27  his way to the scene and I asked him if

28  possibly had a Consent to Search Form that we

29  could fill out with Ms. Woolridge.

30      Q    Did Det. Harmon make it to the

31  scene with a Consent to Search Form?

32      A    Yes, ma'am, he did.

266

1       Q    Did you fill out that form with

2  Ms. Woolridge for a consent to search at 3630

3  Frenchmen?

4       A    Yes, ma'am.

5       Q    Now, did you explain to

6  Ms. Woolridge what this form was?

7       A    I explained to her that it was a

8  consent to search.  It was basically her

9  giving us permission to search her house and

10  that she didn't have to, but if she didn't

11  want to wait for us to get a warrant, then

12  she certainly could if she wished to.

13       Q    Did Ms. Woolridge sign this

14  consent to search form?

15       A    Yes, ma'am, she did.

16       Q    Did she voluntarily sign this

17  form?

18       A    Yes, ma'am.

19       Q    Did you promise her anything for

20  signing the form?

21       A    No, ma'am.

22       Q    Force her into signing the form?

23       A    No, ma'am.

24  MS. AFRICK:

25           Let the record reflect that

26           I'm showing Defense Counsel what

27           I've previously marked as State's

28           Exhibit 15.  May I approach?

29  THE COURT:

30           Yes.

31  BY MS. AFRICK:

32       Q    Detective, I'm handing you what

267

1  I've previously marked as State's Exhibit 15.
2  Can you identify what I've just handed you?
3      A    This is a copy of the Consent to
4  Search Form that Ms. Woolridge and I filled
5  out in her residence.  It's actually in my
6  handwriting, I filled it out, and then this
7  is her signature at the bottom.
8      Q    And did you read the Consent to
9  Search Form to Ms. Woolridge?
10     A    I went over it with her and she
11 read it herself and told me she understood
12 it.
13     Q    And did that Consent to Search
14 Form contain Ms. Woolridge's signature?
15     A    Yes, ma'am, it does.
16     Q    And does it also contain your
17 signature?
18     A    Yes, ma'am.
19     Q    After Ms. Woolridge signed the
20 Consent to Search Form, did you search 3630
21 Frenchmen?
22     A    Yes, ma'am.
23     Q    What was located during the
24 course of the search?
25     A    The first place we searched was
26 -- my understanding was that one of the
27 subjects had been located or had been
28 observed near or on the couch that was in the
29 living room.  So the first thing we did was
30 lifted up the cushions to the couch.  And
31 upon doing that, we observed a handgun, a
32 bottle of gun cleaning oil and a cell phone

268

1  underneath the cushions.
2       Q    Did you take those items into
3  custody?
4       A    We actually left them there, for
5  the moment, until the Crime Lab could come
6  and photograph them and document it.  And
7  then Det. Chambers collected them, as I
8  recorded what he was collecting, the time and
9  things of that nature, and then he
10  relinquished custody to me.  And I secured
11  them in my truck until I could properly log
12  them in at CE&P.
13       Q    Now you stated that during the
14  course of the search of the residence under
15  the couch a handgun, cleaning oil and a cell
16  phone?
17       A    Under the cushions of the couch.
18       Q    Did you locate anything else at
19  3630 Frenchmen?
20       A    Not to my knowledge.  The handgun
21  was loaded, there were additional bullets in
22  it.
23       MS. AFRICK:
24            Thank you.  I have no further
25            questions.  I tender the witness.
26            CROSS EXAMINATION
27  BY MR. BOGGS:
28       Q    Detective, the .45, you testified
29  that when you -- when it was recovered by
30  Det. Chambers, that it was loaded at that
31  time; is that correct?
32       A    It was loaded.  I don't remember

269

1   if there was a round in the chamber.  I
2   documented that if it was.
3       Q     Meaning that the clip was in it
4   and that there were bullets in the clip,
5   correct?
6       A     From what I recall, yes, sir.
7       Q     And a .45 is a large caliber
8   handgun, correct?
9       MS. AFRICK:
10              Your Honor, I'm going to
11              object as to relevance.
12      THE COURT:
13              I'll sustain that.
14  BY MR. BOGGS:
15      Q     Well, are you familiar with the
16  investigation in this matter?
17      A     The initial investigation, I
18  wasn't present for.  Really, the only aspect
19  of the investigation I became involved in is
20  the one for the warrants.  Kevin Burns asked
21  me to accompany the Tactical Unit to the
22  location and document that.  The actual lead
23  up to these warrants, I'm not familiar with.
24      Q     Did you do anything with the
25  materials, the .45, the cleaning oil and the
26  cell phone, other than collect and document
27  them?
28      A     The Crime Lab photographed them.
29  Det. Chambers collected them as I observed
30  and documented.  I brought them back to the
31  office.  I believe at the office I typed up
32  the Central Evidence and Property receipts

270

1   and I logged them in a CE&P.  And I asked the
2   Crime Lab to do the forensic testing to
3   determine if there were any latent prints,
4   ballistics, things of that nature.
5          Q     Are you familiar with the results
6   of those ballistics?
7          MS. AFRICK:
8                  Your Honor, I'm going to
9                  object at this time, outside the
10                 scope.
11         THE COURT:
12                 Sustained.
13         MR. BOGGS:
14                 Thank you, Detective, for
15                 your patience.  No further
16                 questions.
17         MR. MALVEAU:
18                 I don't have anything.
19         MS. AFRICK:
20                 Just one question on
21                 redirect.
22              REDIRECT EXAMINATION
23   BY MS. AFRICK:
24         Q     Detective, did you ask
25   Ms. Woolridge about the .45 caliber weapon?
26         MR. BOGGS:
27                 The .45?
28         MS. AFRICK:
29                 Isn't that what I said?
30   BY MS. AFRICK:
31         Q     In regards to the handgun found
32   at 3630?

271

1      A    Yes.  I took a taped statement
2   from her and in I asked her, while we were
3   all standing around her couch when we removed
4   the cushions, I said, do you recall what we
5   saw?  And she said, "We saw the gun."  I
6   said, is that your gun?  "No, that's not
7   mine."  And she was grateful that we took it
8   out of her house 'cause she had a two-year
9   old and she said as easy as we found it, her
10  two-year old grandson could have found it.
11       MS. AFRICK:
12              I have no further questions.
13       THE COURT:
14              I do.  Detective, you said
15          you three items, a handgun, a
16          cell phone and what was the third
17          item?
18       THE WITNESS:
19              A bottle of gun cleaning
20          oil.
21       THE COURT:
22              Okay.  Thank you.  You may
23          step down.  Anything else by
24          the State?
25       MS. AFRICK:
26              No, your Honor.  No further
27          witnesses by the State.  At
28          this time for motion hearing
29          purposes the State would
30          offer, file and introduce
31          State's Exhibits 1 through 15.
32       THE COURT:

272

1      Would you care for those
2      to be itemized or is there any
3      specific objection, gentlemen,
4      that you'd care to offer?
5  MS. AFRICK:
6      I can go through them item
7      by item.
8  MR. MALVEAU:
9      None for motion purposes.
10  THE COURT:
11      Mr. Boggs?
12  MR. BOGGS:
13      For motion purposes, no,
14      your Honor.
15  THE COURT:
16      For motion purposes let them
17      be admitted.  The Court has
18      yet to listen to the statement.
19      I will do so, actually, right
20      after I entertain this plea for
21      Mr. Tessier.  Let's see if
22      he's ready to do that.
23  (Court handles another docketed matter.  Then
24  takes a recess in chambers to listen to the
25  tape.)
26  THE COURT:
27      Okay.  We're back on the
28      record.  All lawyers are present,
29      along with the two defendants.
30      The Court has completed listening
31      to the tape recorded statement of
32      the defendant, Michael Treaudo.

273

```
1           And with that, I think the matter
2           has already been submitted by
3           the State; is that correct?
4    MS. AFRICK:
5           That is correct, your Honor.
6    THE COURT:
7           Anything by the Defense?
8    MR. MALVEAU:
9           Not on behalf of Mr. Allen,
10      your Honor.
11   THE COURT:
12          As to Mr. Treaudo?
13   MR. BOGGS:
14          Judge, I have no witnesses.
15      I would like to be heard briefly
16      on the statement.
17   THE COURT:
18          I heard you have no
19      witnesses.
20   MR. BOGGS:
21          Yes.  I have no witnesses.
22   MS. AFRICK:
23          Please speak into the
24      microphone so I can hear you.
25   MR. BOGGS:
26          No witnesses, your Honor.
27   THE COURT:
28          Okay, are we ready for a
29      ruling?
30   MR. BOGGS:
31          Judge, I'd like to be heard
32      on the statement.
```

274

1   THE COURT:

2          Certainly.

3   MR. BOGGS:

4          Judge, I believe that there

5          is a question as to whether or

6          not that waiver was knowledgeable

7          and voluntary, your Honor.  The

8          Officer testified that

9          Mr. Treaudo, from the first --

10         there's a two-hour period before

11         the tape recorder is turned on.

12         Your Honor, the only statement

13         that the State intends to produce

14         is one that's after two hours.

15         We just listened to that tape and

16         it is twenty minutes long, almost

17         exactly.

18         And the Officer's testimony

19         is that during that time they

20         were going over the story, Judge.

21         So, the waiver that's signed, and

22         the Court can see that the

23         exhibit stated the time of

24         conclusion at 9:23, that's not

25         evidence that it's voluntary

26         'cause we don't know what's

27         happening during those two hours.

28         It doesn't make sense for two

29         hours and then to have a

30         20-minute statement, Judge.

31         Furthermore, as the Court

32         heard and as the Officer

275

1    testified, Mr. Treaudo was ill at
2    the time of that statement.  I
3    understand he did say that he
4    could continue, but, Judge, if he
5    says I'm sick, I'm ill, you know,
6    and then after having been
7    interrogated for two hours before
8    the tape recorder comes on, I
9    think that that leaves questions,
10   your Honor.
11   THE COURT:
12        State?
13   MS. AFRICK:
14        Yes, your Honor.  First of
15   all, you heard the testimony of
16   the Detective that prior to
17   taking any statement, tape
18   recorded or not, he informs the
19   defendant of his Miranda rights
20   per the Rights of Arrestee Form,
21   which I believe is marked as
22   State's Exhibit 10.  You heard
23   that that was at 7 a.m.  You
24   heard that at time the
25   defendant waived his right to an
26   attorney stated he understood
27   those Miranda rights and wished
28   to make a statement.
29        Now, during the two-hour
30   pre-interview, the Detective
31   stated that during that time
32   at no time did he force,

276

threaten or coerce him.  At no
time did he promise him anything.
He stated that during that time
he wasn't even acting ill.  Now
you heard the defendant in
regards to his illness or the dry
heaving or whatever we want to
call it.  That portion is
actually being recorded.  And you
hear the Detective asking over
and over, "Are you okay, sir?"
and "Do you need EMS?"  In fact,
after you hear the vomit noise
the final time and then you hear
the Detective say, "Are you well
enough to continue?" and the
defendant says, "Yes."  At all of
these times he could have said,
I need medical treatment.  At all
these times he could have said,
I'm not well enough to continue,
I'm done and he never says that,
your Honor, so it's voluntary.

I'm going to cite two cases
in regards to him being -- to the
illness and the voluntariness of
it.  This is a Fourth Circuit
case, State vs. Woods, 553 So.2d
985.  In that statement the
defendant had been shot six
times.  The Court still finds his
statement voluntary.  He's

277

1    suffering from six gunshot wounds
2    when this officer takes his
3    statement and they find his
4    statement voluntary.
5         Here we're only taking about
6    him dry heaving for a matter of
7    minutes or seconds and you here
8    him saying, "I'm well enough to
9    continue.  I don't need EMS."
10   You heard the Detective say, do
11   you need -- he offered something
12   to drink pre-interview.  He
13   thinks he smoked a cigarette.  He
14   had a glass of water.  He offered
15   him food.  You hear on the tape
16   him say, "Do you need a coke?"
17        I'm also going to cite --
18   there's a second case,
19   State vs. Hahn, (spelled
20   phonetically) 526 So.2nd 260,
21   this statement, the Court found
22   was voluntary.  It was made while
23   the defendant was in the
24   emergency room after suffering a
25   gunshot wound to his face.  In
26   both of those cases, the
27   defendants are suffering gunshot
28   wounds and the Court finds those
29   statements were voluntary.  So,
30   all we're talking about is he's
31   feeling a little under the
32   weather.

278

```
 1              The Detective even asked,
 2         "Are you okay?"  He says, "Yeah,
 3         I just have a cold.  No, I don't
 4         need a doctor."  So, in regards
 5         to that, the statement is
 6         voluntary and, your Honor, I'd
 7         ask that you deny the motion to
 8         suppress the statement.  The
 9         Detective testified that he did
10         not intimidate him, he did not
11         threaten him, he didn't promise
12         him anything, that he seemed
13         sober, he seemed in control of
14         his faculties and we believe at
15         this point we've sustained our
16         burden in proving that this
17         statement was freely and
18         voluntarily given.
19    THE COURT:
20              Thank you both very much.
21         The Court will grant the motion
22         to suppress statement.  The Court
23         will deny the motion to suppress
24         identification.  The Court will
25         deny the motion to suppress
26         evidence.  I will note an
27         objection on behalf of the
28         Defense to the Court's rulings.
29    DEFENSE COUNSEL:
30              Thank you.
31    THE COURT:
32              Let's set a trial date.
```

279

```
 1     MR. MALVEAU:
 2              Judge, we can set trial
 3         date, but just for the record,
 4         your Honor, I'm going to be
 5         filing a Motion to Sever.  So
 6         I would like to know if the
 7         Court would like to set a status
 8         date, Judge, and then we can
 9         pick a trial date now or we
10         can pick a trial date then.
11     THE COURT:
12              That's fine.
13     MS. AFRICK:
14              Your Honor, we can set a
15         status date one week from
16         today.
17     THE COURT:
18              That's fine.  File your
19         motion by then so we can
20         address that.
21     MR. MALVEAU:
22              I'll file it, your Honor,
23         and give the state a copy.
24     MS. AFRICK:
25              One week from today will
26         take us to 2/4.
27
28                    *    *    *
29
30
31
32
```

280

1

2                    C E R T I F I C A T E

3

4         I, BARBARA C. WALLACE, Certified

5    Court Reporter, in and for the State of

6    Louisiana, do hereby certify that the

7    aforementioned hearing in the matter of STATE

8    OF LOUISIANA vs. MICHAEL ALLEN MICHAEL TREA,

9    Case No. 490-990 was reported by me in

10   shorthand and transcribed under my personal

11   direction and supervision, and is a true and

12   correct transcript, to the best of my ability

13   and understanding;

14

15

16

17

18

19

20

21

22

23

24   _Barbara  C  Wallace_

25   BARBARA C. WALLACE  #87123
     CERTIFIED COURT REPORTER



26

27

28

29

30

31

32

281